# PROVIDENT LIFE & ACCIDENT INS. CO. v. CAMPBELL.— 79 S. W. (2d) 292.

## PENN MUT. LIFE INS. CO. v. SAME.

Eastern Section.   August 25, 1934.

Petition for Certiorari denied by Supreme Court, February 23, 1935.

Taylor & McCanless, of Morristown, and Frantz, McConnell & Seymour, of Knoxville, for Provident Life & Accident Ins. Co.

Kennerly & Key, of Knoxville, for Penn Mut. Life Ins. Co.

McMahan & Gilbreath, of Morristown, for Mrs. G. H. Campbell.

FAW, P. J.   The transcript contains the record of two separate cases tried together by consent in the circuit court.

One of these cases is an action brought by Mrs. H. E. Campbell (also known in the record as Mrs. Gertrude H. Campbell) against the Provident Life & Accident Insurance Company, upon an accident insurance policy issued by said company on July 18, 1932, to H. E. Campbell, by which policy said insurance company agreed to pay the sum of $1,000 in the event of the death of the insured by accidental means as defined in the policy.   The insured, H. E. Campbell, died on October 2, 1932.   The plaintiff, who was the wife of the insured, was named as the beneficiary in case of his death.

The other of the two cases is an action brought by the same plaintiff upon a life insurance policy issued by the Penn Mutual Life Insurance Company on April 13, 1927, to H. E. Campbell, in the sum of $1,000, and providing for double indemnity in case of the death of the insured by accidental means.   The plaintiff was likewise named as beneficiary in the last-named policy.   The amount of ordinary life insurance, viz., the sum of $1,000, was paid to the beneficiary by the insurer, but the insurance company denies liability for the "double indemnity."

The cases were tried to a jury, and the jury found the issues in favor of the plaintiff and against the defendants, and assessed the plaintiff's damages at $1,000 and interest from the date of the filing of suit in each of the two cases.

The trial court overruled a motion for a new trial on behalf of each of the defendants, and rendered judgment against the defendant on the verdict in each case for $1,020 and one-half of the costs of "the consolidated cases," and declared a lien on the recoveries for the "reasonable or contract fees" of plaintiff's attorneys.

The defendants, the insurance companies, have appealed in error

to this court and have separately assigned errors here. However, the assignments of error present substantially the same questions for decision, with an exception, which will be first examined.

1. The Penn Mutual Life Insurance Company assigned error upon the action of the trial court in overruling its demurrer to plaintiff's declaration.

(The Provident Life & Accident Insurance Company did not demur to the plaintiff's declaration against it.)

So far as necessary to be stated for the consideration of the demurrer, the plaintiff avers in her declaration that said insurance policy issued by the defendant Penn Mutual Life Insurance Company contains, under the caption "Double Indemnity Benefit," the following:

"The Company agrees to increase the amount to double the face amount stated above upon receipt of due proof that the death of the insured resulted solely from bodily injuries sustained through accidental means before the policy anniversary on which the age of the insured at nearest birthday is seventy years, as provided in section five."

And that section 5 of said policy reads as follows:

"Double Indemnity Benefit: The Company will pay a Double Indemnity Benefit equal to and in addition to the face amount of this Policy, upon receipt of due proof that the death of the insured resulted solely from bodily injuries effected directly and exclusively by external, violent and accidental means, and that such death occurred within sixty days after sustaining such injuries. This Double Indemnity Benefit shall not be payable if the death of the insured resulted directly or indirectly from illness or disease of any kind or from physical or mental infirmity; from poison administered whether accidentally or intentionally by the insured or by another; from self-destruction at any time whether sane or insane; from any violation of law by the insured; from aeronautic or submarine casualty; or if the injuries were sustained while performing Military or Naval Service in time of war or riot, or while performing police duty as a member of any Military or Naval or Police organization. The Company shall have the right and opportunity to examine the body and to make an autopsy unless prohibited by law."

Plaintiff's declaration contains further averments as follows:

"Plaintiff alleges that on October 2, 1932, while her said husband, Henry Elbert Campbell, the insured, was driving his automobile West Third North Street, near the Methodist Episcopal Church in Morristown, Tennessee, and at or near the intersection of said Street and Jackson Street, he accidentally drove said automobile against and over the body of one Harlan Davis, an infant son of Charles Davis, thereby crippling and maiming said child, and as a result of

said accident and injury said insured received a terrific physical and mental shock, as a result of which the insured himself died in about thirty minutes after said accident. That immediately after the accident and within a period of about five to ten minutes the insured was driven to the Morristown General Hospital, to which the injured child had been taken, upon arrival there was suffering intensely from shock, called a physician and was treated for said shock and by said physician was directed to be taken home and put to bed where he could remain quiet, until said shock abated; that he was immediately taken home and within five minutes after his arrival there he died. . . .

"Plaintiff further alleges that the death of her said husband, the insured, was caused by the shock he received at the time of said accident above detailed, and that his death resulted solely from the shock and injuries thereby received at the time and place of said accident, through accidental means, and that his death was, therefore, accidental within the meaning of the terms and provisions contained in said policy contract, and as a matter of law and fact.

"And she avers that defendant's denial of liability and failure to pay her, the Beneficiary under said policy, the full amount of double indemnity insurance contracted to be paid, was a breach of said insurance policy contract, and that she is, therefore, entitled to sue for said amount."

Aside from the general demurrer that the declaration does not state a cause of action against the defendant (which need not be considered because of its generality) the grounds of the demurrer are as follows:

"(a) Because the declaration shows upon its face that the death of the insured, Henry Elbert Campbell, did not result solely from bodily injuries effected directly and exclusively by external, violent and accidental means.

"(b) Because the declaration shows upon its face that the death of the insured, Henry Elbert Campbell, did not result solely from bodily injuries.

"(c) Because the declaration fails to show that the death of the Insured, Henry Elbert Campbell, did not result directly or indirectly from illness or disease of any kind, or from physical or mental infirmity."

It is seen that, according to the averments of the declaration, the death of the insured was caused by "a terrific physical and mental shock" resulting from an accidental collision of an automobile, driven at the time by the insured, with the body of a child, and that the death of the insured resulted from said shock. This means, of course, that the death of the insured was caused by a physical shock and a mental shock.

From the definitions of the noun "shock," given in Webster's New International Dictionary and Funk and Wagnalls New Standard Dictionary, we find that a "shock" is "a sudden agitation of the physical or mental sensibilities" (Webster); that a physical shock is "a blow, impact, collision, concussion, or violent shake or jar" (Webster) or "a violent collision of bodies, or the concussion caused by it; a sudden striking or dashing together or against something" (Standard Dictionary); that a "mental shock" is "a sudden agitation of the mind; startling emotion; as the shock of a painful discovery, a shock of grief or joy" (Standard Dictionary); and that in a medical or pathological sense a "shock" is "a sudden depression of the vital forces of the entire body, or a part of it, marking some profound impression produced upon the nervous system, as by severe injury, a surgical operation, profound emotion, or the like" (Webster), or "a prostration of the bodily functions, as from sudden injury or mental disturbance" (Standard Dictionary).

The above-mentioned policy does not purport to be a contract of indemnity against death effected by all accidental means; and the demurrant asserts that the declaration shows upon its face that the death of the insured did not result solely from bodily injuries effected directly and exclusively by external, violent, and accidental means. If this be the proper interpretation of the declaration, it does not state a good cause of action, and the demurrer should have been sustained. Illinois Commercial Men's Association v. Parks (C. C. A.), 179 F., 794, 800; Maryland Casualty Co. v. Morrow (C. C. A.), 213 F., 599, 600, 52 L. R. A. (N. S.), 1213; Kerns v. Ætna Life Insurance Co. (C. C. A.), 291 F., 289, 292; Chase v. Business Men's Assurance Co. (C. C. A.), 51 F. (2d), 34; Cretney v. Woodmen Accident Co., 196 Wis., 29, 219 N. W., 448, 62 A. L. R., 675, 679; Ryan v. Continental Casualty Co. (C. C. A.), 47 F. (2d), 472, 473; Smith v. Federal Life Insurance Co. (D. C.), 6 F. (2d), 283, 285; Stanton v. Travelers' Insurance Co., 83 Conn., 708, 78 A., 317, 34 L. R. A. (N. S.), 445 and Note; Tuttle v. Pacific Mutual Life Insurance Co., 58 Mont., 121, 190 P., 993, 16 A. L. R., 601, 608; Robinson v. Ætna Life Insurance Co. (Tex. Com. App.), 276 S. W., 900, 902; Brown v. Maryland Casualty Co. (C. C. A.), 55 F. (2d), 159; Travelers' Insurance Co. v. McConkey, 127 U. S., 661, 8 S. Ct., 1360, 32 L. Ed., 308; Lincoln National Life Insurance Co. v. Erickson (C. C. A.), 42 F. (2d), 997, 1000; National Masonic Accident Association v. Shryock (C. C. A.), 73 F., 774.

The foregoing authorities hold, in varying forms of statement, that, in actions upon insurance policies, the burden of proving that the case is within the terms of the policy rests primarily upon the plaintiff. It is a necessary sequence of the rule just stated (when fundamental rules of pleading are applied) that the declaration must

contain averments which bring the case within the terms of the policy. Lancaster Mills v. Merchants' Cotton-Press Co. et al., 89 Tenn., 1, 32, 14 S. W., 317, 24 Am. St. Rep., 586; Stone v. Fidelity & Casualty Co., 133 Tenn., 672, 676, 182 S. W., 252, L. R. A., 1916D, 536, Ann. Cas., 1917A, 86; Ramsey v. Fidelity & Casualty Co., 143 Tenn., 42, 45, 223 S. W., 841, 13 A. L. R., 651.

"As applied to contracts of accident insurance, the doctrine of proximate cause is clearly distinguished from its application to a case of ordinary negligence, the distinction being that in accident insurance contracts the liability is measured by the contract, and the doctrine of proximate cause is applicable only in determining whether or not an injury is caused solely by the act or accident against which indemnity is given, while in ordinary negligence cases the proximate cause determines the existence of liability." Mc-Burgess v. Federal Life Insurance Co., 5 Tenn. App., 284, 287, and cases there cited.

It was necessary, therefore, that it appear from plaintiff's declaration against the Penn Mutual in the instant case that the death of the insured resulted solely from bodily injuries effected directly and exclusively by external, violent and accidental means; and a fortiori the declaration was bad if it affirmatively appeared therefrom that the death of the insured did not result solely from bodily injuries effected directly and exclusively by external, violent, and accidental means.

The parties had the right to contract for such limited liability of the insurer. Lehman v. Great Western Accident Association, 155 Iowa, 737, 133 N. W., 752, 42 L. R. A. (N. S.), 562, 565. Such contracts have been very generally held valid by the courts, although there has been a considerable diversity of opinion with respect to their application to particular facts. 5 Couch on Insurance, section 1136.

We see no reason to conclude that the words of the above-mentioned policy were used in any other than their usual and ordinary sense.

The adverb "solely" means "without another; single; alone" (Webster).

The adjective "bodily" means "of or pertaining to the body, in distinction from the mind" (Webster).

"Directly" means "in a direct way; without anything intervening; not by secondary, but by direct. means" (Webster).

"Exclusively" is synonymous with "solely," supra. (See Bechtel's Synonyms).

The definition of the adjective "external" is: (1) "Outward, exterior: relating to the outside, as of the body; really being without; acting from without, as the external surface of a body;" and (2)

"outwardly; perceptible, visible; physical or corporeal; as distinguished from mental or moral" (Webster).

"Violent" is defined by Webster as follows:

"(1) Moving, acting, or characterized, by physical force, especially by extreme and sudden or by unjust or improper force; furious, vehement; as a violent storm or wind; a violent attack. (2) Marked by, or due to, strong mental excitement; vehement, passionate; as, violent speech; violent reproaches. (3) Produced or effected by force; not spontaneous or natural; unnatural; abnormal, as, a violent death. (4) Acting with or exerting great force on the mind, or as evidence; nearly conclusive; as in the phrase, often used in legal contention, violent presumption. (5) Great; extreme;—used intensively; as a violent contrast in colors, violent pain, passion, etc."

The definition of the adjective "accidental" is "happening by chance, or unexpectedly; taking place not according to the usual course of things; casual, fortuitous" (Webster).

Webster defines the noun "mean" as follows: "That through which, or by the help of which, an end is attained; something tending to an object desired; intermediate agency or measure; necessary condition or co-agent; instrument;—now usually in the plural form, means, with singular sense and construction."

According to plaintiff's declaration against the Penn Mutual, the death of the insured resulted from the combined effects of a physical shock and a mental shock. The determinative question to be decided upon the demurrer is, therefore, whether, under the "Double Indemnity" clause of the policy in question, H. E. Campbell was insured against death resulting, in part, from "mental shock."

"Broadly speaking, an accident policy is intended to apply to all cases of disability which are the natural and ordinary results of external physical injury due to accident." 5 Couch on Insurance, section 1136, p. 3957.

But, in order to fall within the terms of the Penn Mutual policy here in question, the death of the insured must have resulted solely from bodily injuries, and, such bodily injuries must have been effected directly and exclusively by external, violent, and accidental means.

Manifestly the contract contemplated that the insurer should be liable for the "double indemnity" only in the event that death resulted solely from bodily injuries effected directly by some external physical force actually directed against the body of the insured, which did not include a "mental shock" as defined by the lexicographers and generally understood in common parlance. We are, therefore, of the opinion that the trial court erred in overruling the grounds of the demurrer hereinbefore designated as (a) and (b), and the first assignment of error of the Penn Mutual Life Insurance Company is sustained.

■ The demurrer hereinbefore designated as (c) was not well made, for the reason that rules of pleading do not require the plaintiff to negative exceptions in the insurance contract. 21 R. C. L., p. 485, par. 48.

The plaintiff's declaration against the Provident Life & Accident Insurance Company does not contain an averment that the death of the insured resulted from a "mental shock," and there was no demurrer to that declaration.

The question is made by the first assignment of error of the Provident Life & Accident Insurance Company and the second and third assignments of the Penn Mutual Life Insurance Company that the trial court erred in overruling the respective motions of the defendants for directed verdicts, and that there was no evidence to support the verdicts. The motions for peremptory instructions were made at the close of the plaintiff's evidence, which was all the evidence, as the defendants rested on their motions for peremptory instructions and did not offer any evidence.

The Provident policy insures H. E. Campbell "against loss" (including "loss of life") "resulting solely from bodily injuries . . . effected directly and independently of all other causes through accidental means."

This policy also provides that: "The insurance herein provided shall not extend to cover . . . any disability or loss caused directly or indirectly, wholly or partly by bodily infirmity, ptomaines, bacteria infections (except pyogenic infections which shall occur simultaneous with and through an accidental cut or wound) or by any other kind of disease, or by medical or surgical treatment therefor."

The insured, H. E. Campbell, died about 11 o'clock a. m. on Sunday, October 2, 1932. He was at that time about forty-three years of age, and appeared to be in good health. He was a large man, somewhat "overweight," but active in his business of selling farm implements and machinery as a traveling salesman for the International Harvester Company and in his favorite sport of hunting.

The insured lived in Morristown, and on the Sunday morning above mentioned he attended Sunday school at the First Baptist Church in Morristown, a few blocks from his home; driving to the church, accompanied by his wife and children, in his automobile.

Insured left the church in his automobile immediately after the dismissal of the Sunday school, intending to take one of his children home and then to drive into the country to feed his bird dogs, but before reaching his home, and while driving along and over a smooth paved street, at a moderate rate of speed, a small child suddenly ran in front of his automobile. Insured applied his brakes, and the child passed beyond the sweep of the car, but seemingly became confused and turned back and ran in between the front fender and

bumper of the insured's car and was knocked down and seriously injured; his leg or legs being broken. Insured stopped his car within fifteen or twenty feet of the point of the collision with the child; the "stop" being made gradually and smoothly and without collision with any other object.

Insured got out of his car as soon as it stopped, but by that time by-standers had picked up the child and some of them placed it in an automobile and took it to a hospital a few blocks distant. One of the first persons to reach the child was the witness M. K. Strate, who says (referring to the insured) that "he was pale and beads of perspiration standing out on his face, and his whole appearance looked as though he would not be able to drive his car, so I suggested we take the child in my car."

The insured followed the child to the hospital and gave directions to call a doctor to attend the child. Mr. Strate saw insured at the hospital, and he says that "at that time he was very, very nervous and would get up and sit down again, and again, and I suggested that he go into the hospital and lay on a bed which he did and I went into the room with him and he would not lie on the bed. He would lay down for a minute and then sit up and he said, 'Oh, I ache all over, I ache all over.'" The testimony of M. K. Strate, with respect to the manner in which the child was injured and the appearance of the insured immediately thereafter and at the hospital, is substantially corroborated by the witness G. M. Morrison. Insured remained at the hospital approximately twenty minutes, and was then taken to his home by a friend, and died at his home a few minutes after his arrival there. While insured was at the hospital as before stated, Dr. Painter, who was attending the injured child, was called to the hospital office to see insured. Dr. Painter testified that, "At that time, he found Insured, suffering with great excitement, nervousness and shock; that he did not make a careful examination of the Insured;" that "he (Insured) was so excited I immediately gave him a hypodermic of morphine and advised him to go home and lie down and rest and keep quiet," and that insured immediately left the hospital and witness did not see him again.

The witness J. O. Phillips took insured to his (insured's) home from the hospital, after Dr. Painter had given him a "hypodermic." Mr. Phillips testified that the trip from the hospital to the insured's home occupied three or four minutes; that when insured reached his home, "he was very nervous" and said, "I believe I will go to bed;" that witness procured insured's pajamas for him and insured put them on and went to bed; that insured was "perspiring easily;" that in response to a question insured said he felt "awful bad;" that a few minutes later, insured said to witness, "Jim I am going to faint;" that witness procured some camphor and a towel from the bathroom and then went to have a doctor called, and when he

returned to the insured's bedroom insured was dead; that insured died in twelve to fifteen minutes from the time he reached his home.

Plaintiff introduced and relies upon the testimony of two physicians, viz., Dr. F. F. Painter and Dr. R. A. Purvis.

Dr. Painter, a graduate physician who had practiced in Morristown for about twenty-five years and had "handled a great many cases of people in shocked condition as a result of accident and things of that kind," gave the testimony which we have already related with reference to the condition of the insured at the hospital a few minutes before his death, and he (Dr. Painter) was then examined and cross-examined, as an expert medical witness, with respect to what, in his opinion, was the cause of the death of the insured.

The full substance of Dr. Painter's testimony on the latter subject is contained in certain excerpts therefrom, as follows:

"Q. From your observation of Mr. Campbell there at the hospital and the shocked condition he was in, which you have stated and observed, what would you say in your opinion, your professional opinion, was the cause of his death? A. Most probably cerebral hemorrhage.

"Q. What could it have been? A. Coronary occlusion; or angina pectoris.

"Q. What is coronary occlusion? A. The heart has muscles like every other organ and the blood vessels have to be supplied with blood for the muscles and the coronary arteries supply this muscle of the heart with blood; sometimes owing to a diseased condition these blood vessels become partially or totally occlusioned and consequently the heart does not receive any blood and consequently goes into a condition of so-called spasm or cramp, and the patient dies.

"Q. That is one thing it could have been? A. Yes sir.

"Q. You do not know that it was that? A. No sir.

"Q. Was there any evidence of that at that time? A. No sir.

"Q. What is angina pectoris? A. It is practically the same thing, depending upon the condition of the blood vessels in the heart; owing to great excitement, stress, anger or over exertion, anything of that sort, any of these things, where there might be such a strain upon the heart for more blood than the heart vessels can supply, consequently the heart then goes into a spasm and the patient dies as a result. If a man has arteriosclerosis or hardening of the arteries, hardening of the blood vessels in the legs, it is on the same principle as lime in a pipe, the pipe becomes smaller, and if there is a chalk substance in the blood vessels, they cannot carry as much fluid as normally, now blood vessels become filled with chalk as a result of disease and they are smaller and as a result of excitement owing to excessive strain, stress or exertion the blood vessels cannot carry as much blood to the muscles as the muscle requires,

462

so if a man has this condition and walks up hill or exercises too much his legs gets cramp and becomes very painful and he has to stop and rest a little while until the pain is relieved and the muscles get enough blood while he is quiet; and if he exerts again he has pain. Now with angina pectoris if a man is under excitement or stress or over exertion he will suffer with intense pain in the heart, and in a very short time will die as a result of this spasm. Now this man had no pain so far as I know; he did not complain of anything, therefore I say it was a ruptured blood vessel.

"Q. If he had complained of pain you would say it was angina pectoris? A. Yes.

"Q. What is cerebral hemorrhage? A. They all belong to this same group where the blood vessels have become chalky in the brain as a result of arteriosclerosis. Any undue excitement will cause an increased pressure and increased flow of blood, and they break and flood the brain killing the patient.

"Q. What would you say was the proximate cause of this man's death, was it the result of shock of the accident, or not?

"Mr. Key: Defendants object to this question because the proximate cause of this man's death is not at issue.

"The Court: He can give his opinion. (Defendants excepted to the ruling of the court.)

"Q. Give your opinion? A. I am inclined to believe the man died solely as a result of this accident.

"Mr. Anderson: The defendants object to this testimony because the question calls for the expression of an opinion, and not as an expert the opinion is stated, and that invades the province of the jury.

"Mr. McMahan: He is a medical expert, and is qualified,—that is admitted. His qualifications are admitted.

"The Court: The objection is overruled. (Defendants excepted to the ruling of the court.)

"Q. What do you mean by that—do you mean he received the shock as detailed to the jury—do you mean he received bodily injury? A. No he did not receive any bodily injury, that is a result of having a bodily injury to himself, but due to the intense nervousness and excitement of the accident it caused ruptured blood vessels in the brain; if he had not had the accident he would probably be living now.

"Q. If it was not for the ruptured blood vessels and this injury he would be probably living today? A. Yes but an injury you cannot see—there was no external evidence.

"Q. It was an injury to him and you claim it was the result of the accident? A. In my opinion I think so.

"Mr. Anderson: Defendants object—(1) Because the question is leading and suggestive, and (2) the same objection as above stated.

"The Court: I sustain the objection on the ground it is leading and suggestive.

"Q. Just state in your own way what caused this man's death? A. As I have just stated I am of the opinion that owing to the conditions of this man's blood vessels, that this shock which he sustained in this accident was sufficient to cause increased flow of blood through the blood vessels and the blood vessels were ruptured in the brain as a direct result of this intense excitement he sustained at that time.

"Q. Had you ever treated him before? A. Once or twice for some minor illness.

"Q. Did you ever treat him for anything else? A. No sir.

"Q. When did you treat him—how long before this accident? A. I do not know positively but a month or two before that probably.

"Q. At that time did you observe any condition in him that would lead you to believe that he had angina pectoris or any disease as you have stated? A. No, I saw no evidence of that, these changes which take place in the blood vessels are not always evidenced; while it is claimed a man has high blood pressure, yet changes will take place in the brain with no evidence; and some blood vessels might be chalky while others are not, and you cannot determine when these blood vessels take on these changes.

"Q. It is difficult for a medical expert to find it? A. Yes unless it has gone on for a long time, then it is easy to detect it.

"Q. Is it easy for the subject affected to know it? A. He does not know anything about it.

"Q. He could have coronary occlusion and the conditions that make possible a cerebral hemorrhage and not know it? A. Yes sir.

"Q. Assuming that up to this time he had good health and was an employee of the International Harvester Company and traveled through this country calling on machinery dealers and farmers and helped set up machinery, and that as a matter of diversion he fox hunted with his neighbors and climbed fences and walked over the country at night, up to the time of his death—assuming those things, —was there anything to indicate he did have disease or anything that an average person would know about? A. Assuming these conditions I would say he knew nothing about it—like a man walking on the street apparently with no disease, falls with a cerebral hemorrhage. It happens very frequently.

"Q. One of your fellow practitioners, Dr. Ruble, died with angina pectoris, did he? A. Yes—and Mr. Witt, a few days ago, apparently he was well, the night before in perfect health—apparently, so far as he knew.

"Q. Dr. Ruble practiced his profession up to the time of his death? A. Yes he was very busy that day, he had a very busy day the day he died. And Mr. Witt waked out of a sleep and died in a very short time.

"Q. Do you know that Dr. Ruble was examined at the Mayo hospital a short time before and pronounced perfect? A. Yes."

Cross-examination:

"Q. You say there was no external evidence of any sort of injury to Mr. Campbell—is that correct? A. That is correct.

"Q. An autopsy in that case would be of great use to determine the cause of his death? A. It would determine the cause of his death.

"Q. Over what period after he died would an autopsy have disclosed it? A. I really could not say; I have had no experience with autopsies for that kind of a purpose, but I should say from four to five days.

"Q. Would you say at the end of sixty days the body would have been in such condition as would show the cause of his death? A. I should think it would depend on whether the body was embalmed or not.

"Q. Assuming that it was embalmed properly, in 45 to 60 days would it be in condition to permit an autopsy? A. I do not know; I am not expert on that line.

"Q. An autopsy would be the only way to definitely determine the cause of his death, would it not? A. Yes, it could have been determined by an autopsy; it could have been determined that way.

"Q. You referred to a chalky condition of the blood vessels—what is that? A. We usually say hardened arteries or arteriosclerosis.

"Q. When the blood vessels become hardened it causes greater pressure in the flow of blood through the blood vessels? A. Owing to the chalky condition of the blood vessels are narrowed like the pipe with lime in it, consequently it takes more force to force the blood through than if they were not sclerosed or hardened.

"Q. The blood vessels are somewhat flexible? A. Yes, like elastic.

"Q. And when the pressure gets too great it breaks and the fluid flows out—the blood vessel bursts? A. Yes.

"Q. It is your opinion that the blood vessels of Mr. Campbell were in that chalky condition and when the additional pressure was brought to bear by excitement the blood vessels gave way and allowed the hemorrhage to occur? A. I think that is correct.

"Q. It is your opinion the hemorrhage resulted in his death? A. Yes sir.

"Q. It was the pre-existing condition of chalky blood vessels coupled with the pressure of undue excitement that resulted in the hemorrhage in this case? A. That is correct.

"Q. Neither one of those conditions alone, exclusive and separate from the other condition would cause death? A. He had to have the chalky condition or hardened condition of the blood vessels to cause death; the excitement alone would not cause it.

"Q. He had to have this pre-existing condition of diseased blood vessels and arteries to have caused death? A. He did. . . .

"Q. State whether Mr. Campbell's death resulting from failure

of his heart or coronary occlusion or cerebral hemorrhage, any one of those conditions, would be necessarily contributed to and caused by the pre-existing condition of disease of those arteries plus excitement from the automobile collision? A. That is right.

"Q. The excitement alone from the automobile collision would not produce death? A. No, if he had been in normal health, if he had been a normal healthy man it would not, but the question is—when is a man a normal and healthy man—you know I may be in normal health and be dead in fifteen minutes.

"Q. That is the situation present at all times with any individual, the condition of the heart and brain and muscle, and if he had this diseased condition plus the excitement it might result in death? A. Yes that is right, it would.

"Q. If he did not have this condition the excitement alone would not result in death? A. No sir.

"Q. Arteriosclerosis is recognized in the medical profession as a separate and distinct disease? A. Yes it is recognized as a condition of the blood vessels—a disease of the blood vessels."

Re-examination:

"Q. Is that such a disease you can know about, like typhoid fever or tuberculosis, or is it a hidden disease? A. It is often hidden; the hardening of the blood vessels may be local or general; he may have hardened blood vessels in the legs and nowhere else, or he may have it in the brain and nowhere else, or in the heart and nowhere else—but there is a certain amount everywhere of course.

"Q. Assuming he was working every day and engaged in recreation at night, such as fox hunting, and walked and traveled over the country—was he the sort of person who would have the hidden type of such a disease? A. He would, for I don't think he knew anything about it.

"Q. Assuming that morning he got up and took his family to Sunday School with his automobile and started home with the children afterward, telling his wife he would go back for her and then had this accident and as a result of that accident had the shock which caused his death—that he had that accident with the automobile—would he in your opinion have died that day? (Defendants object to this question. Objection overruled. Defendants excepted.)

"A. I think the man would have lived.

"Q. He would probably be living yet? A. Yes probably be living yet.

"Q. Arteriosclerosis—is that a cause or a condition? A. It is a condition."

It is seen that the opinion of Dr. Painter, based upon his "observation of Mr. Campbell there at the hospital and the shocked condition he was in," at that time, was that "the cause of his death," was "most probably cerebral hemorrhage," but that it could have been

coronary occlusion or angina pectoris; that there was no evidence of coronary occlusion at the time witness saw insured at the hospital, but that insured's death could have been caused by coronary occlusion; that if insured had "complained of pain" witness would say he died of angina pectoris, but so far as witness knew, insured had no pain, therefore, witness would "say it was a ruptured blood vessel."

In this connection, it may be recalled that there is proof that insured "complained of pain," in the testimony of plaintiff's witness M. K. Strate, which we have hereinbefore copied; that is to say, Mr. Strate stated that while at the hospital insured repeatedly said, "Oh, I ache all over."

Recurring to Dr. Painter's testimony, it is seen that he stated that he was "inclined to believe" the insured "died solely as a result of this accident." And that "if he had not had the accident he would probably be living now," but that there was no "external evidence" of injury to insured; that insured "did not receive any bodily injury," and that his death was not the result of a bodily injury to himself, but was "due to the intense nervousness and excitement of the accident;" that, in his opinion, "the blood vessels of Mr. Campbell were in that chalky condition and when the additional pressure was brought to bear by excitement, the blood vessels gave way and allowed the hemorrhage to occur" and "the hemorrhage resulted in his death;" that "it was the pre-existing condition of chalky blood vessels, coupled with the pressure of undue excitement that resulted in the hemorrhage;" that arteriosclerosis is recognized by the medical profession as "a disease of the blood vessels;" and that insured "had to have this pre-existing condition of diseased blood vessels and arteries to have caused death," that "the excitement alone would not cause it."

We think it obvious that the testimony of Dr. Painter not only fails to show a breach of either of the contracts of insurance involved in this case, but (if the opinions he expressed are to be accepted as evidence) his testimony proves affirmatively that the death of H. E. Campbell did not result from a cause against which he was insured by either of the defendants.

The injury itself, whether it was "cerebral hemorrhage," or "coronary occlusion," or "angina pectoris," was not an "accident." That was the result, and "not the means through which it was effected." Shanberg v. Fidelity & Casualty Co. (C. C. A.), 158 F., 1, 19 L. R. A. (N. S.), 1206, 1210.

Dr. R. A. Purvis, whose "qualifications" were admitted by counsel and who had been practicing in Morristown for a little over two years, stated that he knew H. E. Campbell, the insured, and had seen him "professionally" twice. Dr. Purvis' opinion as to the cause

of the death of the insured was stated mainly in response to hypothetical questions, as will be seen from his testimony as follows:

"Q. I want to ask you first a hypothetical question: Assuming that on Sunday morning, October 2, 1932, Mr. Campbell had gotten up, dressed, shaved, and so forth, and as customary had taken his wife and children to Sunday School at the First Baptist Church, and after Sunday School was over that he started home to take the children expressing his intention to his wife that he would be back for her, and that after driving about two blocks and a half or just around the block he accidentally ran over a child at which time the child was crippled and maimed probably screaming and that at the time he appeared to be shocked and was taken to the hospital or went to the hospital, and assuming that at the time of the accident he was unable to speak for a few minutes or get out of his automobile for three or four minutes, and decided to drive to the hospital then, and after driving a block decided he was not able to do so and asked a by-stander to drive him and that after arriving at the hospital he was so weak he could not walk up the steps without assistance, and after he was in the hospital it was necessary to call a physician and he gave him a sedative and that under the advice of the physician he went home and died in three or four minutes after he got on the bed—what do you say was the cause of his death, taking the position that he had had the accident and knocked the child down and broke his leg—take all of those circumstances and the other matters regarding him which I detailed resulting in his death about 30 minutes later? A. I would say the pre-disposing cause of his death was shock.

"Q. How do you say he received the shock—by reason of what? A. Probably the accident, that seems to be the only thing.

"Q. Nothing else in the picture? A. You would have to call that the pre-disposing cause.

"Q. He received this physical shock? A. And mental shock.

"Q. As a result of striking the child with the automobile? A. Yes sir.

"Q. By the exertion of the person in an effort to avoid striking the child who suddenly ran out in front of his automobile, that caused it?

"Mr Anderson: Defendants object to that question as leading.

"The Court: Let him answer. (Defendants excepted.)

"A. That would cause the same strain as the accident itself; it would all be the same thing.

"Q. What do you say his death was directly incident to? A. There would be two or three factors, the shock though, the state of mental and physical shock, where the blood rushes away from the brain and collects in the abdominal vessels.

"Q. Would that be the direct cause of his death? A. Yes.

468

"Q. Is there anything else that might enter into the picture—would it be the direct or indirect cause of death? A. First he would have the shock and the blood would collect in the large blood vessels of the abdomen—that happens always during condition of shock, and the blood pressure drops remarkably.

"Q. What would you say he died with, now, Doctor, was it angina pectoris or cerebral hemorrhage? A. I would say following this shock where the blood pressure drops so low, then the blood returns to the brain with such force or pressure he would probably have cerebral hemorrhage.

"Q. What do you say from the hypothesis presented to you, he died of? A. Probably from cerebral hemorrhage as a result of receiving shock from the mental nervous strain of the accident.

"Q. Assuming that up to this time he had been normal and worked for the International Harvester Company and traveled about over the country and sold machinery and helped fix up machinery, helped to set it up, and that on this morning in that condition he drove his automobile to the church and things of that kind—assuming these things are true—would there be anything about his condition to lead you to believe or determine or upon which to base an opinion that he had any diseased condition such as could be observed? A. No sir.

"Q. Assuming also that afterward he drove on this street in his automobile and that while driving on this street he struck a child and as a result of striking this child he had shock and as a result of the two he died—would you say if that accident in which the child was involved had not occurred he would be living? A. He probably would.

"Q. If it were not for the shock—and the shock I mean which he received from the accident to the child—he would probably be alive today? A. Yes sir."

Cross-examination:

"Q. It would be your opinion that Mr. Campbell had the chalky or hardened condition of the arteries in the heart and brain too, prior to the excitement on this occasion? A. Yes.

"Q. How old was he? A. Forty-three and one-half.

"Q. He would have some hardened condition of the arteries at that age wouldn't he? A. Yes he would have some slight hardening of the arteries at his age.

"Q. The hardened condition of his arteries coupled with unusual pressure of the blood brought about by the excitement would cause rupture of the blood vessels? A. Yes.

"Q. And those two factors caused his death? A. Yes the actual cause.

"Q. You examined him eight months prior to his death did you not? A. Yes sir.

"Q. At that time his blood pressure was about ten points above normal? A. Yes sir.

"Q. That condition if it continues results in increased hardening of the arteries and is evidences of hardening of the arteries at that time? A. If the pressure, the blood pressure increases it does; he did not have hardened arteries at that time; he had ten points which is due to weight.

"Q. The fact his death resulted from cerebral hemorrhage which in your opinion was brought about by diseased condition of the arteries plus the shock, confirms your opinion that this high blood pressure evidenced the hardened condition of his arteries in February, 1932? A. No, because there was no hardening of the arteries at that time.

"Q. How can you tell that? A. By palpitation of them.

"Q. Could you tell where there was hardening of the arteries in the brain? A. Yes, the arteries are all hardened all over the body and if you do not get thickening or hardening in the legs or wrists you can assume there is none elsewhere.

"Q. Are there not hidden forms of hardening of the arteries? A. I don't know of any you cannot diagnose; there is one form where there is a local hardening in the feet and ankles and lower limbs; but that can be diagnosed; I never knew of a case of hardened arteries inside the brain and not have them anywhere else in the body.

"Q. It is your opinion that Mr. Campbell's death was due to the pre-existing diseased conditions of the arteries in the brain coupled with the shock he received when he struck the child? A. My opinion is that he died from cerebral hemorrhages brought on by shock from the accident, but so far as his arteries being hardened I would not be able to say, and they do not have to be hardened for him to have died.

"Q. You would expect to have a diseased condition of the arteries before death would result as it did? A. It is usual but not necessary.

"Q. You did not see Mr. Campbell after the accident? A. No it had been eight months since, or one time since that I saw him with a cold after I examined him the first time.

"Q. How much did Mr. Campbell weigh in February, 1932? A. I don't know; he was about fifteen pounds over-weight, I remember his blood pressure was ten points above normal and his weight fifteen pounds over; all I advised him was to reduce his weight.

"Q. You do not remember what it was? A. No, but it was fifteen pounds over what it should be.

"Q. You advised him to reduce his weight? A. Yes sir.

"Q. And that if he did not he would probably have serious trouble? A. Probably his blood pressure would go up higher, yes."

Re-examination:

"Q. Is there anything particularly disturbing about blood pressure being 10 points, high or low? A. No sir.

"Q. Mine has been about 15 to 18 points low for fifteen years and I am still here kicking around—so then a man's blood pressure may be high or low but it does not mean he is liable to die any minute? A. No it usually requires from 50 to 60 points to cause death.

"Q. What was his condition with reference to being normal when you examined him in February? A. I then made complete physical examination and urinal examination and he was perfectly normal except a crippled leg he had since childhood, with slight over-weight and slight rise in blood pressure. !

"Q. How long would it take a diseased condition such as coronary occlusion or angina pectoris to develop? A. It can develop in two 'or three years ordinarily; one who finally dies from coronary occlusion may have had the disease going on for 10 to 15 years, but a man who overworks or overdrinks or overeats can do it in two to three years.

"Q. Could it develop in that time since you examined him? A. No, not enough to give him coronary occlusin.

"Q. Or angina pectoris? A. No.

"Q. You were asked if the death of Mr. Campbell was caused by pre-existing conditions plus the shock—now which one caused his death—the pre-existing condition or shock? A. My opinion is that there was no pre-existing condition that had much to do with his death, the shock caused such rapid change in the blood pressure as that the arteries were not able to accommodate the strain; I have seen cases die of that without pre-existing conditions.

"Q. You mean death was caused in this case by shock? A. Yes.

"Q. Had he not had the accident which caused the shock, would he be living, in your opinion, today? A. Yes sir."

It is seen that, in response to the direct question, "what do you say from the hypothesis presented to you, he died of," Dr. Purvis said: "Probably from cerebral hemorrhage as a result of receiving shock from the mental nervous strain of the accident." We may say here, parenthetically, that the testimony of the two physicians we have quoted was admitted without objection, other than the objections noted in the quotations, and there are no assignments of error which question the competency of any of the evidence admitted by the trial court.

It is disclosed by an analysis and comparison of the testimony of Dr. Painter and that of Dr. Purvis that the only point on which they disagree in their opinions is as to whether the mental excitement of the insured, created by the injury to the Davis child, could have caused a cerebral hemorrhage in the absence of a pre-existing disease of the blood vessels, viz., arteriosclerosis.

Dr. Painter expressed the positive opinion that insured "had to

have this pre-existing condition of diseased blood vessels and arteries to have caused it;" that "the excitement alone would not cause it."

Dr. Purvis said: "It is usual, but not necessary . . . to have a diseased condition of the arteries before death would result as it did;" that "so far as his arteries being hardened," he "would not be able to say;" that "they did not have to be hardened for him to have died;" that in his opinion "there was no pre-existing condition that had much to do with his death;" that the witness had "seen cases die of that without pre-existing conditions."

From a casual reading, it would seem that there is a contradiction between the last-mentioned testimony of Dr. Painter and an excerpt from a previous part of his testimony, which we here repeat, as follows:

"Q. It would be your opinion that Mr. Campbell had the chalky or hardened condition of the arteries in the heart and brain too, prior to the excitement on this occasion? A. Yes.

"Q. How old was he? A. Forty-three and one-half.

"Q. He would have some hardened condition of the arteries at that age wouldn't he? A. Yes he would have some slight hardening of the arteries at his age.

"Q. The hardened condition of his arteries coupled with unusual pressure of the blood brought about by the excitement would cause rupture of the blood vessels? A. Yes.

"Q. And those two factors caused his death? A. Yes the actual cause."

■ ■ If Dr. Purvis' testimony should be treated as first affirming that the death of the insured was caused by two factors, viz, "the hardened condition of his arteries coupled with unusual pressure of the blood brought about by the excitement," and then later affirming that insured had no pre-existing disease of the blood vessels, and that the cerebral hemorrhage from which (in his opinion) insured died resulted solely and exclusively from the mental nervous strain of the accident, his entire testimony on this point would go for naught, and could not be considered on motion for peremptory instructions. Johnston v. Railway Co., 146 Tenn., 135, 157, 240 S. W., 429.

But a careful examination of Dr. Purvis' testimony fails to reveal a positive statement therein, that, in his opinion, arteriosclerosis was not a "factor" in causing the cerebral hemorrhage which, he believed, resulted in the death of insured. Dr. Purvis said: "My opinion is that there was no pre-existing condition that had much to do with his death." The implication from this latter statement is that a "pre-existing condition" had something, although not "much," to do with insured's death; and this is reconcilable with the witness' previous testimony that, in his opinion, "Mr. Campbell had the chalky or hardened condition of the arteries in the heart and brain too, prior to the excitement on this occasion;" that "the hardened

condition of his arteries coupled with unusual pressure of the blood brought about by the excitement" caused "rupture of the blood vessels;" and "those two factors caused his death."

So it is that, according to plaintiff's proof, the death of the insured resulted from two efficient and operative causes, one of which was the excitement or "mental disturbance" incident to the injury to the little Davis child, and the other was a pre-existing disease of his blood vessels, and that his death did not result solely and exclusively from either of these causes, independent of the other.

The proof, therefore, precludes a finding of liability of either of the defendants under the terms of the policy contracts involved in these cases. The adjudged cases involving, in many different aspects, similar insurance contracts are so numerous that it would be impossible to discuss them within any reasonable limits. Many of them are digested in a note to the case of Stanton v. Travelers' Insurance Co., 83 Conn., 708, 78 A., 317, as reported in 34 L. R. A. (N. S.), 445; Note in 52 L. R. A. (N. S.), 1203; Annotation, 3 A. L. R., 1304, and Annotation, 82 A. L. R., 1411. Some of the same and other cases are cited in the footnotes to section 1136 of Couch on Insurance.

The rule we deduce from the cases involving accident insurance contracts similar to those here under consideration, is that, if the insured, at the time of the alleged accidental injury, was also suffering from a disease, and the accident aggravated the disease, or the disease aggravated the effects of the accident and actively contributed to the disability or death, there can be no recovery upon the policy.

However, if pre-existing disease should be excluded as a "factor" in the cause of H. E. Campbell's death (which we do not hold), we are of the opinion (as we have hereinbefore held in disposing of the demurrer of the Penn Mutual) that a purely "mental shock," due to excitement or "mental disturbance" such as that disclosed by the proof in the record before us, is not a bodily injury within the contemplation of the insurance contracts involved in these cases.

The cases upon which the learned and able counsel for plaintiff mainly rely for support of their contention that a death from "mental shock" is a death resulting solely from bodily injuries, effected directly and exclusively by external, violent, and accidental means (as provided in the Penn Mutual policy), and a death resulting solely from bodily injuries effected directly and independently of all other causes through accidental means (as provided in the Provident policy), are Horsfall v. Pacific Mutual Life Insurance Co., 32 Wash., 132, 72 P., 1028, 63 L. R. A., 425, 98 Am. St. Rep., 846; McGlinchey v. Fidelity & Casualty Co., 80 Me., 251, 14 A., 13, 14, 6 Am. St. Rep., 190; and Equitable Life Assur. Soc. v. Gratiot, 45 Wyo., 1, 14 P. (2d), 438, 446, 82 A. L. R., 1397.

The Horsfall Case, supra, is criticised in a case note, 19 L. R. A. (N. S.), 1208, as being "out of harmony" with the prevailing view.

We are not prepared to agree with the reasoning of the court in some of the dicta in the McGlinchey Case, supra; but it is sufficient for present purposes to say that the court there found that the death was caused by "physical," as well as "mental," shock. In the midst of the opinion the court said, "Our belief is, on the facts legitimately before us, that death was produced by a ruptured blood vessel about the heart, and that such rupture was caused by the extraordinary physical and mental exertion which the deceased put forth to save his children and himself from injury. The physical strain and mental shock was more than he could bear. In this calculation of the facts, we have come easily to the conclusion that, as between these parties, physical and external causes effected the death."

In the Gratiot Case, supra, an automobile driven at the time by the insured ran off the road and plunged down an embankment into a deep ditch. The insured died nine days later, and an autopsy disclosed the fact that he died from a cerebral hemorrhage. There was evidence tending to show that the insured's car went off the highway "because of a car approaching from the rear crowding him," but this was a matter of controversy, and, in this connection, the court said: "Our attention is called to the testimony of Dr. Kamp, fortified by that of Dr. Hillkowitz, that the decedent's going off the road, as well as his mental condition subsequently, might have been caused by reason of the decedent's arteriosclerosis."

There was conflicting testimony by medical witnesses, as to whether the accident or the diseased condition of the insured's arteries, or both combined, caused his death. The court held that the evidence presented issues for the jury to determine, and said in the course of the opinion: "We cannot say as a matter of law that the facts in this case—the automobile plunging down a steep and deep embankment and against rocks—do not show an accident adequate and sufficient to produce the injury resulting in death. Even Dr. Kamp, defendant's witness, admitted that 'hemorrhage of the brain from existing aneurysm perhaps would be caused from shock from running off the road.' And, as we read the evidence, the testimony of Dr. Hillkowitz is not clear as to what was the 'primary' or 'efficient' cause of death. These matters were, we think, a proper subject for medical opinion."

The Provident Life & Accident Insurance Company rested its motion for peremptory instructions below, in part, upon the proposition that the beneficiary in the policy (the plaintiff here) declined to permit an autopsy in accordance with a provision of the policy that, "The Company shall have . . . the right and opportunity to make an autopsy in case of death where it is not forbidden by law," and the refusal of the trial court to direct a verdict on this

ground is included in the first assignment of error of the Provident Company in this court.

The insured died on October 2, 1932, and a request for an autopsy was made of the plaintiff by or on behalf of the Provident Life & Accident Insurance Company on or after October 10, 1932, which was several days after the burial of the body of the insured. Plaintiff states in her testimony that a request for an autopsy was made as above stated, and that she declined to grant it for "a personal reason."

The policy contains no provision for the exhumation of the body after burial. The courts "have uniformly denied the right of the insurer to insist, by virtue of a provision for an autopsy, upon exhumation of the body for the purpose of examination or autopsy, as a condition to liability." 8 Couch on Insurance, section 1958, p. 6504.

In an Annotation on the subject of "provisions for autopsy in policy of life or accident insurance," appended to the case of United States Fidelity & Guaranty Co. v. Hood, 124 Miss., 548, 87 So., 115, as reported in 15 A. L. R., 605, 614, it is said that such provisions for autopsy have been recognized by the courts as reasonable and proper, but that, "though differing somewhat as to the grounds of their decisions, it may be noted that the cases have uniformly denied the right of the insurer to insist by virtue of the provisions under consideration, upon exhumation of the body for purposes of examination or autopsy as a condition of its liability under the policy;" and a considerable number of adjudged cases are cited in support of the latter statement, and no cases to the contrary are cited. We are not aware of any case in this state ruling the point, but we think the rules above stated are sound, and we accordingly hold that the defendant was not entitled to a directed verdict because of the refusal of plaintiff to consent to an autopsy upon the undisputed facts disclosed by the evidence.

For the reasons hereinbefore stated, the first assignment of error of the Provident Life & Accident Insurance Company (except in so far as it is based upon the plaintiff's refusal of an autopsy), and the second and third assignments of error of the Penn Mutual Life Insurance Company, are sustained.

The Provident Company's second assignment of error and the Penn Mutual Company's fourth, fifth, and sixth assignments of error complain of certain parts of the charge of the trial judge to the jury, as follows:

"(a) In the first policy sued on, that is the case of Gertrude H. Campbell vs. Penn Mutual Life Insurance Company, the policy is for $1,000, with a provision that upon the payment of an additional premium they contract to pay the insured $1,000 extra; provided he loses his life by purely an accidental cause; and they have paid the

$1,000. The question is whether they are liable for the second $1,000.

"Was the death of the insured purely accidental, within the meaning of this policy? That is the same question in the other case—the case of Gertrude H. Campbell vs. The Provident Life and Accident Insurance Company. That is an accident and health policy and it does not contain the double indemnity clause like the first policy but does insure the deceased in the sum of $1,000, in case of· accidental death of the insured. The question is the same in both cases—was the death of Campbell purely accidental within the meaning of the provisions of these policies?

"(b) I instruct you, gentlemen of the jury, that before the plaintiff can recover on either of these policies she must show by a preponderance or greater weight of the evidence, first—that her husband, Henry Elbert Campbell, was insured—and that is admitted, the policies are in evidence; and second, that he was killed and lost his life; and third—that it was the result of an accidental cause purely. In other words—was the death accidental? If you find from the evidence, that is from the preponderance of the evidence that it was an accident, an automobile accident in which the child spoken of in the record was run against and over by the insured and that that resulted in such shock to him as that disconnected with all or any other causes he died it would be an accidental death within the meaning of the policies and plaintiff would be entitled to recover.

"(c) You must find that that death was accidental before she could recover, that is accidental within the meaning of the policies. I instruct you that has this meaning; that it resulted alone from the shock, disconnected from other causes of the insured's death."

The third (and last) assignment of error of the Provident Company and the seventh (and last) assignment of the Penn Mutual Company is that the trial court erred in declining a request of the defendants to charge the jury as follows:

"(a) The plaintiff, Gertrude H. Campbell, cannot recover upon either of the policies sued upon in these suits unless it appears from the preponderance of the evidence that the death of H. Elbert Campbell was the direct result of injuries caused by accidental means, and independently of all other causes. The expression 'independently of all other causes' as used in each of the two policies has a definite meaning and requires the plaintiff to prove by a preponderance of the evidence that the injuries claimed to have been sustained by H. Elbert Campbell were proximately the sole cause of his death, or, in other words, that the injuries were alone responsible for his death.

"So, if you believe that the accident, coupled with a pre-existing disease consisting of a chalky condition of the arteries, or other

diseases, acting together, caused his death, the defendants would not be liable.''

In view of our holding that the demurrer of the defendant Penn Mutual Life Insurance Company to the declaration of the plaintiff against it should have been sustained, and our further holding that the trial court should have directed the jury to return a verdict in favor of the defendants, these latter assignments, which complain of the charge of the court given to the jury and of the failure to charge the special request above quoted, are, of course, now immaterial, so far as the opinion and judgment of this court is concerned.

However, on the hypothesis that the evidence in the record presented issues for the determination of the jury (which we do not hold), we are of the opinion that the charge was erroneous, in that the jury were, in substance and effect, thereby instructed that the plaintiff was entitled to recover if the death of the insured resulted solely from mental shock caused by the injury to the Davis child. The second assignment of the Provident Company and the fourth, fifth, and sixth assignments of the Penn Mutual Company are, therefore, sustained.

The special request copied into the third assignment of the Provident Company and the seventh assignment of the Penn Mutual Company is not accurate, in that it contains the statement that the expression ''independently of all other causes, as used in each of the two policies,'' which is, in effect, a statement that the expression ''independently of all other causes,'' is used in each of the two policies. This ''expression'' is used in the Provident policy, but is not used in the Penn Mutual policy. There is language of similar import, perhaps equivalent in meaning, in the Penn Mutual policy, but it is not expressed in the same words, and the trial court will not be put in error for declining a request which is not accurate. The latter two assignments are overruled.

It results that the judgments of the circuit court are reversed, the verdicts are set aside and the plaintiff's suits are dismissed.

The costs of the two cases, including the costs of the appeal, will be adjudged against the plaintiff, Mrs. Gertrude H. Campbell.

Crownover and DeWitt, JJ., concur.