GUARDIAN LIFE INS. CO. OF AMERICA v. RICHARDSON.
—129 S. W. (2d) 1107.

Middle Section.   March 25, 1939.

Petition for Certiorari denied by Supreme Court, June 10, 1939.

Templeton & Stevens, of Fayetteville, for plaintiff in error.
W. B. Lamb, of Fayetteville, for defendant in error.

FAW, P. J.   This case is here on the appeal in error of The Guardian Life Insurance Company of America, defendant below (and hereinafter called defendant), from a judgment for $408.45 and the costs of suit, against it and in favor of C. W. Richardson, plaintiff below (and hereinafter called plaintiff).

Plaintiff sued the defendant in the court of a Justice of the Peace of Lincoln County, and from a judgment rendered by the Justice of the Peace for the plaintiff the defendant appealed to the Circuit Court of Lincoln County, where the case was tried before the court and a jury, and, after the Trial Judge had overruled a motion for peremptory instructions on behalf of the defendant at the close of all the evidence, and had submitted the case to the jury, a verdict was returned by the jury finding the issues in favor of the plaintiff. A motion for a new trial filed by the defendant was overruled, and thereupon the Court rendered judgment against the defendant as aforesaid, and the defendant prayed, was granted, and perfected an appeal in the nature of a writ of error to this Court, and has assigned errors here.

Plaintiff's action was brought to recover disability benefits stipulated in a life insurance policy for $3000, issued by defendant insurance company to plaintiff Richardson on November 27, 1917, but which, for some reason not disclosed by the record, was not delivered to the plaintiff until sometime during the year of 1918.

It appears from the bill of exceptions that after the jury was selected, empaneled and sworn, the following proceedings were had:

"The Court:   This case comes here on appeal from a justice of the peace court, so the attorneys for each side will state their respective contentions to the jury.

"Whereupon Mr. W. B. Lamb, attorney for the plaintiff read the warrant to the jury and stated that the plaintiff was insured by a certain life insurance policy issued to him on November the 27th, 1917, for three thousand dollars, which policy he exhibited to the jury and read the following provisions:

" 'If the Insured before attaining the age of sixty years becomes wholly and permanently disabled, the Company, besides waiving payment of premiums hereunder will pay to the Insured a disability annuity equal to one-tenth of the face amount of this policy subject to the provisions of paragraph 24 thereof.

" 'The first premium of Ninety Dollars and Sixty Cents will be payable on delivery hereof and further premiums of like amount (of which $5.34 is for the disability benefits and $3.75 for the double indemnity benefit hereunder) will be payable on the twenty-seventh day of November Nineteen Hundred and Eighteen and every twelve

calendar months thereafter during the continuance of this policy until the death of the Insured or as otherwise stated in paragraph 24 hereof' . . .

" '24. Total and Permanent Disability Benefits.

" 'Whenever the Company shall receive due proof during the continuance of this policy and before default in payment of premium that the Insured has become wholly and incurably disabled by bodily injury or disease, not due to any cause or condition existing at the time of delivery hereof or to military or naval service in time of war, so that he is and will be presumably thereby permanently and continuously prevented from engaging in any occupation whatsoever for remuneration or profit and that such disability has existed continuously for not less than sixty days prior to furnishing such proof—the permanent loss of the sight of both eyes, the loss of both feet above the ankles, the loss of both hands above the wrists, or a similar loss of one hand and one foot, to be regarded as constituting total and permanent disability without prejudice to other causes of disability —then the Company will grant disability benefits as follows:'

"Said attorney stated that it was plaintiff's contention that he had not defaulted in payment of premiums, was totally and permanently disabled as required by the policy, had given due notice and made due claim for disability benefits, which claim (the present annuity payment of $300.00) had before bringing suit been denied by the defendant company, which issued the policy. That the plaintiff in order to preserve his rights under the policy after denial of his claim had paid the premium of $90.60, and that plaintiff therefore contended for said $300.00 benefit with interest and said $90.60 with interest from date, the same being paid under protest.

"Whereupon, Robt. W. Stevens, one of defendant's attorneys, stated to the jury that the defendant insisted it did not owe the plaintiff anything. That no question was made as to the filing of notice and claim, but that the plaintiff was not disabled, or if disabled, that he was not disabled as required by the policy to recover."

It thus appears that the issue for determination below was, whether plaintiff Richardson was totally and permanently disabled, within the policy definition of such disability, and that such disability had existed continuously for not less than sixty days prior to the time he furnished "proof" thereof to the defendant.

Defendant's first assignment of error in this Court is, that there is no evidence to support the verdict; and its second assignment is that, the Trial Court erred in overruling the defendant's motion, made at the close of all the evidence, for a directed verdict in its favor.

In a case of this character, "the burden of proving that the case is within the terms of the policy rests primarily upon the plaintiff." Provident Life & Accident Insurance Co. v. Campbell, 18 Tenn. App., 452, 456, 79 S. W. (2d), 292, 295.

■ In order to sustain a verdict for the plaintiff in the instant case, there must be material evidence that "the insured has become wholly and incurably disabled"; that he has become thus "disabled by bodily injury or disease"; that he has become thus disabled to such a degree that "he is and will be presumably thereby permanently and continuously prevented from engaging in any occupation whatsoever for remuneration or profit"; that such disability was "not due to any cause or condition existing at the time of delivery" of the policy; and that "such disability has existed for not less than sixty days prior to furnishing" proof thereof to defendant. Patey v. Metropolitan Life Insurance Co., 19 Tenn. App., 634, 93 S. W. (2d), 1271, and other cases there cited.

It is necessary to ascertain whether there was material evidence from which the jury could find the existence of the foregoing facts essential to a verdict for plaintiff. The case is, in its facts, somewhat out of the ordinary, and, in order to understand and properly evaluate the contentions of the parties, an outline of the life history of the plaintiff is necessary.

Plaintiff is about fifty-one years of age. He was born, and lived until he was twenty-six years of age, in Moore County, Tennessee. He then bought a farm, known as the "Ashby place" (for five thousand dollars), in Lincoln County, Tennessee, and lived there during the years of 1914 and 1915. In 1916 he sold the Ashby place to "Mr. Conger", and was employed in 1916 and 1917 as superintendent of Mr. Conger's farms, which aggregated eleven hundred acres. In the fall of 1917, he bought, and moved to, a farm in Lincoln County containing two hundred and ten acres, known as the "King place," and at that time resigned his position as superintendent for Mr. Conger.

Plaintiff sold the King place in 1918, at a profit of $3650, and, in addition, made several thousand dollars from his crops, live stock and trading while on the King place. In 1918, plaintiff bought the "Sutton farm," near Bellville, in Lincoln County, containing one hundred and thirty or one hundred and forty acres, for ten thousand dollars or twelve thousand dollars, and moved to it, and was living on the Sutton farm, with his wife and children, when what he describes as his "nervous breakdown" occurred in 1920 and 1921.

Before passing to the narration of the evidence relating to plaintiff's "nervous breakdown," it may be stated that the undisputed testimony of plaintiff is that, *prior to 1920,* he was in "perfect health," and he was an extremely active, industrious and successful farmer and trader, not merely as manager and superintendent of his farm, but engaging in all kinds of manual labor incident to the cultivation and operation of a farm; and his testimony in this respect is corroborated by his witnesses Pitts and Loving.

It would be difficult to successfully paraphrase the plaintiff's de-

scription of his "breakdown," and we will therefore quote an excerpt from his testimony as follows:

"Q. Mr. Richardson, what is the first thing you remember relative to your breakdown? A. Well, in 1920 I got so I couldn't get around like I used to. I had to depend on the little boys, when I come in from the field at night they would have the feeding and milking done. I would have to lay down and rest before I could go to the house. My wife always had a tub of water ready for me to take a bath. Sometimes I would go to sleep before I could get through with supper and they would have to get me up and get me to bed. I had in a crop and it looked like I couldn't do enough, I just worked all the time, I would do more than two or three men. I had my crop in and was up and going in 1921 as I recall, I think it was in 1921 any way they had a gambling crowd in Bellville and I lived across from some of them, about 100 yards or more. Some men come one day to see me about helping to break it up they wanted me to suggest a plan to break it up. There was something like $1400.00 or $1500.00 in fines paid. It seems that all of them decided I had done it when I really had no part in it.

"Q. Did you get a notice of some kind that they had turned against you? A. Yes sir, so it seemed like they all turned on me at once. They got me worried then my sister in Nashville died and that liked to have killed me I never have got over it, it just seemed like everything crushed around me. Everything come on me at once and I got sick and got down, the Dr. said it was flu. I think this happened around the last of November.

"Q. Now, Mr. Richardson you have told about the trouble coming up and the neighbors turning against you, now tell exactly when the collapse came on. A. I don't know the date, I had been working on the hillside, it was in a bad shape I had several men working for me, four or five working for me, I was making a road through a thicket. I could not work enough all I wanted was water and work, when I went to dinner I broke down and cried, I didn't eat anything I just got up and got me a jug of water and went back to work. I did more work than three men. My father-in-law and brother-in-law and others was along. As we started home that evening we come to a little old bush not worth anything at all and my brother-in-law said I believe I will cut this down, when he said that I just give down and cried. They carried me to the house and I went down and just got worse.

"Q. In other words the collapse came when the bush was cut did it? A. Yes, sir, everything just crushed around me.

"Q. As a result of this breakdown you were sent off to an institution were you? A. Yes, sir.

"Q. Where did they send you? A. To Dr. Douglas in Nashville.

"Q. Were you sent there by inquisition or by a jury? A. No, I was not sent by a jury.

"Q. You were sent to the Dr. Douglas Institution were you? A. Yes, sir.

"Q. How long did you stay there? A. Until the last of November.

"Q. When did you have the breakdown? A. It was some time in February.

"Q. In the spring was it? A. Yes sir.

"Q. And you stayed until November? A. Yes sir, but they didn't carry me right off as soon as I had the breakdown, Dr. Ashley was my Dr., and he tried to help me before I was sent.

"Q. And you stayed until November I believe you said? A. I think that is right.

"Q. When was it that you were declared of unsound mind by a jury? A. I don't know, directly after I got home I believe.

"Q. Mr. Richardson, how long has this nervous disease been in your family? A. I couldn't say.

"Q. How long do you remember it being in the family? A. On my grandfather's side, I have heard them say that he was afflicted like my greatgrandmother, I believe that is where they say it started.

"Q. Did your grandfather suffer the same way? A. Yes sir.

"Q. How about your father? A. In 1915 my father's health give down and he stayed two years in the Central State Hospital.

"Q. Is that the Insane Hospital in Nashville? A. Yes, sir.

"Q. How long was he there? A. Two years I think. I got him to go up there the first time, then in the year 1921 he was there, and then in 1931 he give down again and I went to see him. He called me in his room and he said 'I had rather die than to go back up there.' I said if you will not try to hurt any of us I will not carry you back. I didn't carry him back and he died in 1932.

"Q. You have been informed that this mental disease came from your greatgrandmother, and her father now are there any others in your family that have suffered from this disease? A. There was Uncle Tom when I was a boy 16 or 17 years old I remember hearing them talk about how he acted, about being crazy, father would tell us about him. Then Uncle Berry had brights disease and lost his mind before he died. He didn't last long after he took his bed. Then Uncle Jim T. died, his mind left him before he died.

"Q. Then you remained in this institution until the last part of November 1921? A. Yes sir.

"Q. Were you the same man after you had this trouble that you were before you had it? A. No sir, not at all.

"Q. How are you different now from what you were then? A. Like I am now I can't do anything, before I had the breakdown I could do anything. I can't keep myself together now. Dr. Douglas didn't want me to come home when I did. But I felt like I had to come home to my wife and two little boys. But I couldn't do anything I just went all to pieces, I couldn't work and when I tried I went to pieces.''

Plaintiff, with his family, moved from his home near Bellville to the town of Fayetteville in the year of 1923, and lived in Fayetteville for nine years, then returned to Bellville for three years, after which he moved back to Fayetteville, where he has since made his home.

Plaintiff testified further, in substance, that (since his "breakdown"), he has made a few land trades; that when he makes a "deal" in a land trade he gets nervous and shakes; that he has not worked much, and has not done any work that "there was any profit to"; that when he tries to work his back gets stiff and sore; that when he gets excited he goes "all to pieces"; that he can't "do any physical labor like changing a tire"; that he likes to work and likes to make money, but that he does not attempt to do anything "of any importance"; that he potters around a little to pass off the time and to keep himself "quieted down," and that he does "a lot of walking to keep from getting nervous."

On cross-examination, plaintiff testified that he is "drawing" from two other companies—$200 a year from one and $50 a month from another; that at the time of his breakdown he owed about $5000; that "this gambling trouble" happened in 1920, and "all of it" (meaning, as we understand, all of the causes previously mentioned in his testimony, including the "gambling trouble") had something to do with his "breakdown" in 1921; that, in the last year or two, Mr. Loving (a real estate agent) had subdivided and sold a parcel of land, known as the "Smith place" near Fayetteville, for him (plaintiff); that he would talk to Mr. Loving and talk to his wife and they would "agree about selling it." Plaintiff was asked if he was successful in that trade, and he replied: "I have made so many I don't remember."

Plaintiff also testified that following his "nervous breakdown," he "got better." In this connection, we quote:

"Q. You get around down town a good deal don't you Mr. Richardson? A. Yes, the Dr. advised me to walk, when anything bothers me I walk, if I am having a conversation with anybody and it doesn't suit me I walk off. When anything bothers me I just walk and it seems to help me. Lots of time I am up town and back several times during the day.

"Q. Since you have been in town have you worked a garden? Have you worked a garden in the last 10 or 11 years? A. Last year I had a little garden in the back yard.

"Q. Have you made a garden before that? A. Yes sir, I have had a garden and I would work in it until I give out then I would lay down and rest a while and work some more then I would change my old clothes and maybe go to town."

Plaintiff's witness R. A. Pitts had known plaintiff "since he was a boy." Pitts testified that before plaintiff went to the sanitarium, plaintiff was an active and energetic man, but since that time he has

never been the same kind of man; that "he is nervous and can't do anything;" that the "change" is both physical and mental; that all that witness knows is that plaintiff "is easily excited," and, as an illustration, he related an incident when plaintiff's wheat field "got afire" and plaintiff "give out and said it would have to burn up;" that plaintiff was "as nervous as he could be," and said "just let it burn," but witness "put the fire out." This witness had not seen plaintiff "try any physical labor . . . in late years."

Plaintiff's witness W. O. Loving was in the real estate business in Fayetteville, and had conducted some real estate deals for plaintiff "in which his wife signed the deeds." This witness testified that plaintiff was a "nervous wreck" since his "breakdown;" that plaintiff is nervous, easily excited and "just can't control himself;" that when making a real estate deal, plaintiff "gets restless" and "shakes" and "cannot sit still;" that plaintiff's condition is considerably worse than it was eighteen months ago; that witness does not know of any sort of business that plaintiff "could follow and make a living;" that plaintiff is not "able to run and operate a farm" or "successfully conduct a business." Mr. Loving was asked, "What part does he play in all the trades?" and he replied: "Well, his wife is his Guardian, and if anything comes up that I think he would be interested in I talk to him and then he talks to his wife and lets me know what they want to do."

This witness further stated that he (plaintiff) is not crazy; "his mind is average sometimes and sometimes it is not;" that witness had seen other men, who were not insane, get nervous over a trade; that witness "is not a doctor and don't know what plaintiff's trouble is."

Plaintiff's two sons, Melvin (age twenty-seven) and Paul (age twenty-three), testified as witnesses for plaintiff. Melvin stated that plaintiff "was never the same after he came back from the hospital," and "was never able to work;" that it "is an invariable result" that "every time he does any little thing he goes all to pieces."

Paul testified that plaintiff "is highly nervous and when he tries to do anything, he goes all to pieces;" that he has been that way ever since witness can remember.

The testimony of plaintiff's witness G. H. Scott is, in substance, that he had known plaintiff for a number of years and he had seen him on several occasions when he was in bad shape. He was nervous, his voice quivering and he was "just shot all to pieces."

The witness Eugene Stewart was a member of the "jury of inquisition" that found plaintiff to be of unsound mind in 1921, and he had known plaintiff since that time. Witness has been in the furniture and undertaking business in Fayetteville for the past sixteen years, and plaintiff has used witness' place of business for "loafing" during the past several years. When asked to describe plaintiff's conduct as he had noticed it, this witness replied: "He

just sits around, sometimes he is nervous and blue and seems to be down and out, not able to do any work or labor of any kind.''

The foregoing is the substance of the material evidence in chief introduced for plaintiff.

The defendant called and examined as witnesses Rev. C. C. McQuiddy, pastor of the Christian Church at Fayetteville; O. H. Higgins, Justice of the Peace at Fayetteville; Judge A. E. Simms, County Judge of Lincoln County; L. W. Alexander, insurance and real estate agent at Fayetteville; John A. Poole, ex-sheriff of Lincoln County; Jerry Hastings, business man of Fayetteville; Riggs Woodward, William Downing and E. O. Bayless, three employees in the George F. Carter Drug Store at Fayetteville; Henry Grider, barber in Fayetteville; and Ray Marrs, restaurant operator in Fayetteville.

The general purport of the testimony of the above mentioned witnesses for defendant is that they had known plaintiff Richardson for a number of years, and had seen him frequently (some of them almost daily), and had never observed ''anything wrong with him.''

Mrs. D. A. Hobbs lived just across the street from plaintiff's home in Fayetteville, and her testimony is that she saw plaintiff working in his garden at times; but she did not know how long he would work and did not know whether he ever got ''tired and worn out.''

The remainder of the evidence offered on behalf of defendant consists of the testimony of two physicians, viz.: Dr. H. K. Alexander and Dr. T. A. Patrick.

Doctor Alexander is a graduate physician and has been practicing medicine since 1909. In addition to his qualifications as a general medical practitioner, he qualified as an expert in the ''practice of insanity cases and nervous trouble.'' He had examined plaintiff Richardson three times—twice in 1937 and once in February, 1938. The last examination was made in conjunction with Dr. Patrick.

Doctor Alexander testified that he gave plaintiff ''a thorough physical and mental examination'' and found no organic trouble—nothing wrong with him physically or mentally—and he ''would say he is both physically and mentally competent.''

Doctor T. A. Patrick had been practicing medicine twenty-nine years, and it will be assumed that he possessed the requisite testimonial qualifications, as plaintiff's attorney said, ''We will waive qualifications.'' Doctor Patrick testified that he had examined plaintiff, both physically and mentally, several times, ''over a period of years,'' and had not been able to find anything wrong with him, and had always advised him to go to work.

Plaintiff introduced ''in rebuttal'' (without objection), the testimony of Dr. T. E. Ashley and Dr. J. V. McRady.

Doctor Ashley had been practicing medicine in Lincoln County for thirty-eight years, and had known plaintiff since 1913, and had ''waited on him'' in 1921. Doctor Ashley said:

"In 1921 I believe it was, he had the flu, he got down and had all kinds of nervous trouble and about that time his sister died suddenly and . . . that grieved him, so I did the best I could for him, they had also had some trouble up there and that worried him. I saw he wasn't getting any better so I carried him to the Douglas Institution. He stayed there six or seven months, I believe it was six or seven months. He was living at Bellville then. He come home but he wandered around and was nervous and not able to work. I saw him several times and it looked like he has something on his mind, there was something wrong with him, he didn't seem to get much better. I said to him one day 'Charlie suppose you get out of this, move away, it keeps you torn up all the time' I thought if he would get out of the Bellville community it would help him. I told him to go to town, get away from this life and enjoy some pleasure. He moved away, I was living at Mimosa and was in town two or three times a week, he would wait and look for me to come in, he wanted to tell me about himself and to talk about it all the time. I kept trying to keep him from telling his troubles. I wanted to keep him from talking about it. If he has any trouble in the family he comes to me with it.''

Doctor Ashley further stated that from what he knew about plaintiff he ''can conscientiously say he is not able to work'' and he ''would advise him not to work.''

We quote further from the cross-examination of Doctor Ashley as follows:

''Q. Dr. Ashley, what have you ever been able to find wrong with Mr. Richardson physically, bodily? A. Nothing only with the spinal column, it affects him generally, it affects his digestion, and he can't sleep.

''Q. Would you say there is or not a bodily manifestation of this? A. There is in that when the spinal nerves, consisting of the spinal nervous system, is a part of the body.

''Q. When did you find any objective symptoms in his body, how long has it been since then? A. Well, it is just as I have stated, there has never been any objective symptoms, he has never been free of these symptoms that caused his insanity of 1921, that is since he went to the hospital in 1921. I believe a persons mind once gone due to disease, (now I don't mean from alcohol, he will get over that) but if the loss of his mind is due to disease I believe he will never regain composure again to stand hardships. . . .

''Q. Dr., you have never specialized or paid any particular attention to insanity cases have you? A. Nothing but in general practice, I have come in contact with a lot of it with other sickness, but as far as being intimate with an asylum I never have been.

''Q. Dr., you said something before about Mr. Richardson having a nervous disease, and it not being like a disease cause by alcohol, did Mr. Richardson have a disease that caused his trouble? A. He had the flu.

"Q. When did he have the flu? A. In 1921.

"Q. How did the flu affect him? A. He was all to pieces, he said he could see a black coffin floating around in the back of his head. . . . I had to give him a hypodermic and from then on he kept getting worse so we carried him to the asylum.

"Q. That was seventeen years ago was it? A. It was in the spring of 1921 the best I remember it."

It was stated by plaintiff's attorney (in connection with his objection to certain questions asked by defendant's attorney) that "Dr. Ashley doesn't claim to qualify as an expert."

Doctor McRady is a graduate of the Vanderbilt University Medical School, and during his last year at the Medical School he "was at Central State Hospital doing some work," but, "outside of that," had no experience with mental diseases. He had known plaintiff ten years or more and had examined him "on the average three or four times a year for the last ten years."

Doctor McRady was asked and answered as follows:

"Q. What would you say his condition is now? A. Well, I think that he is mentally unsound, I think that a man with the family background he has and who has had an attack of Depressive Psychosis, that he (is) apt to have another attack at any time. He should not be under too much stress or strain from work or exercise, some exercise is good for him, but with his mental makeup he could never do enough work for a living without having another nervous breakdown."

We quote the cross-examination of Doctor McRady as follows:

"Q. Dr. McRady you have never found any organic trouble have you? A. On two occasions I have found sugar in his urine, after 1935, just on those two occasions I have a record of sugar in his urine.

"Q. Most anybody would be likely to have sugar in their urine wouldn't they? A. No, not most anybody.

"Q. The fact that he had had it on these two occasions wouldn't mean that the Drs., who examined him any other time would find the same condition would it? A. It is a condition that I think is permanent, I don't know that his urinic condition had any part in his mental condition at all or not, that was just an incident.

"Q. Dr., what do you say is the cause of whatever trouble he may have? A. Heredity, mentally weak, not being able to stand the stress and strain of making a living, modern civilization."

Now, upon the evidence in this case, did the learned Trial Judge err in overruling defendant's motion for a directed verdict? A motion for a directed verdict, couched in general terms, may be a sufficient predicate for an assignment of error that the Trial Court erred in declining to sustain such motion; but "if the motion purports to specify the particular ground on which it is rested, the moving party will, on appeal, be confined to the grounds thus speci-

fied.'' Tennessee Cent. Railway Co. v. Zearing, 2 Tenn. App., 451, 455; Lawson v. Producers' & Refiners' Corp., 157 Tenn., 455, 459, 9 S. W. (2d), 1026; Ballow v. Postal Telegraph Cable Co., 12 Tenn. App., 348, 353.

The defendant's motion for peremptory instructions in the instant case was as follows:

''Comes the defendant by its attorney and moves the Court to instruct the jury to return a verdict for defendant.

''1. There is no evidence to support a verdict in favor of plaintiff.

''2. Plaintiff has failed to make out a disability claim as provided by Section 24, that part of the policy on which he brings the suit; as the evidence shows without dispute that if the plaintiff has any disability it is mental and not bodily, although the policy provides that he must be disabled by bodily injury or disease to recover; that it is the undisputed testimony that this injury, if there is one, is mental and not bodily; it is the undisputed proof that if there is a disability it is due to causes or conditions existing at the time of the delivery of the policy, and, therefore, not covered by the policy; it is the undisputed medical testimony, and this Court is bound as to the pathology of the disability by this medical testimony, that there is no bodily manifestation of any disease and, therefore, his claim of the disability in the manner sought to be proved by him cannot exist at all.

''It is undisputed testimony of the medical witnesses that plaintiff is not disabled by any bodily injury or any disease of the body otherwise; there is no evidence anywhere in the record of either lay or medical testimony to support a verdict of total disability; it is the undisputed expert testimony that to engage in his usual occupation, that of farming would be of no harm to him.''

It is seen that the first proposition to which the attention of the Trial Court was directed by the defendant's motion for peremptory instructions was, in substance and effect, that there is no evidence to support a finding that the plaintiff has become wholly and incurably disabled by *bodily* injury or disease.

■ ''The word 'disease,' *unrestricted by anything in the context,* includes disease of the mind as well as disease of the body''. (Italics ours). Connecticut Mutual Life Insurance Co. v. Akens, 150 U. S., 468, 475, 14 S. Ct., 155, 157, 37 L. Ed., 1148, 1150.

But, in the policy here involved, the word ''disease'' is ''restricted'' by the word ''bodily''; and grammatically, the word ''bodily'' modifies ''disease'', as well as ''injury''; and manifestly it was inserted for the purpose of excluding *mental disease.* Accident Insurance Co. v. Crandal, 120 U. S., 527, 7 S. Ct., 685, 30 L. Ed., 740, 743.

The adjective ''bodily'' means ''of or pertaining to the body, in distinction from the mind.'' Webster's International Dictionary.

It was thus defined and applied by this Court in Provident Life

& Accident Insurance Co. v. Campbell, 18 Tenn. App., 452, 457, 79 S. W. (2d) 292, and certiorari was denied by the Supreme Court.

The researches of counsel and this Court have discovered but two cases wherein it has been held that a contract of insurance against bodily disease includes mental diseases. These cases are, American National Insurance Co. v. Denman, Tex. Civ. App., 260 S. W., 226, and Old Colony Life Insurance Co. v. Julian, 175 Ark. 359, 299 S. W. 366, 369.

We have given the opinions in the last above mentioned two cases careful consideration, and, with due deference to the learned courts by whom they were delivered, we are not able to agree to their conclusions therein.

"Contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous, their terms are to be taken and understood in their plain, ordinary, and popular sense. The rule of strict construction does not authorize a perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists, nor does it authorize the court to make a new contract for the parties or disregard the evidence (intention) as expressed, or to refine away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties and embodying requirements, compliance with which is made the condition to liability thereon. Neither does the rule prevent the application of the principle that policies of insurance, like other contracts, must receive a reasonable interpretation consonant with the apparent object and plain intent of the parties." Conley v. Pacific Mutual Life Insurance Co., 8 Tenn. App., 405, 411, 412, quoting from 14 R. C. L., pages 931-932. See also Wray v. Metropolitan Life Insurance Co., 19 Tenn. App., 533, 539, 91 S. W., (2d) 577.

In the view we take of the insurance contract, it is necessary to ascertain whether there is material evidence reasonably tending to show that plaintiff is totally and permanently disabled by "bodily" disease, as distinguished from mental disease; and this presents an issue involving the pathology of disease, that is, "the science treating of diseases, their nature, cause, progress, manifestations and results". Webster's International Dictionary. Such issues are to be determined upon the testimony of qualified medical expert witnesses. American National Insurance Co. v. Smith, 18 Tenn. App., 222, 227, 74 S. W. (2d), 1078; Standard Life Insurance Co. v. Strong, 19 Tenn. App., 404, 424, 87 S. W. (2d), 367, 380; National Life & Accident Insurance Co. v. Follett, 168 Tenn., 647, 80 S. W. (2d), 92. See also, numerous cases cited in Jones on Evidence (2 Ed.), Vol. 1, page 812, Footnote 8.

As we have seen, defendant's medical witnesses, Doctor Alexander and Doctor Patrick (whose "qualifications" are conceded),

testified, upon repeated examinations of plaintiff made by them, that he has no organic trouble, and that there is nothing wrong with him, physically or mentally.

Doctor Ashley (who was plaintiff's attending physician during his illness in 1921) testified that plaintiff "has never been free of these symptoms that caused his insanity of 1921", and expressed the opinion that "a person's mind once gone due to disease" (except alcoholic disease), "he will never regain composure again to stand hardships." (Doctor Ashley did not qualify as an expert).

The testimony of plaintiff's medical witness, Doctor McRady, was directed to the ultimate determinative question in the case, when, in response to the question, "What would you say his condition is now?" he said: "Well, I think that he is mentally unsound, I think that a man with the family background he has and who has had an attack of Depressive Psychosis, that he (is) apt to have another attack at any time. He should not be under too much stress or strain from work or exercise, some exercise is good for him, but with his mental makeup he could never do enough work for a living without having another nervous breakdown."

Obviously the "family background" to which Doctor McRady refers, was the insanity of plaintiff's great-grandmother, grandfather, father, and three uncles; and the definition of the word "Psychosis" is, "a disease of the mind especially, a functional mental disorder, that is, one unattended with structural changes in the brain". Webster's International Dictionary.

Doctor McRady stated that the cause of whatever trouble plaintiff may have is, "heredity, mentally weak, not being able to stand the stress and strain of making a living, modern civilization."

We find nothing in the testimony of the medical witnesses from which it could be reasonably concluded that plaintiff is wholly and incurably disabled by *bodily* injury or disease to such an extent that he is and will be permanently and continuously prevented from engaging in any occupation whatsoever for remuneration or profit; but there is evidence that plaintiff is mentally unsound—afflicted with a functional mental disorder, unattended with structural changes in the brain—due in large measure to heredity. In the absence of proof that plaintiff is disabled by bodily injury or disease, defendant's motion for peremptory instructions should have been sustained. Defendant's first and second assignments of error are, therefore, sustained.

In view of our ruling upon first and second assignments of error, the remaining assignments become immaterial.

It results that the judgment of the Circuit Court is reversed, the verdict of the jury is set aside, and plaintiff's suit is dismissed. The costs of the cause, including the costs of the appeal, will be adjudged against the plaintiff C. W. Richardson.

Crownover and Felts, JJ., concur.