**SOUTHERN ROOFING & PETROLEUM COMPANY, Inc.**

v.

**AETNA INSURANCE COMPANY and Acme Roofing & Sheet Metal Company.**

**Civ. A. No. 6244.**

United States District Court E. D. Tennessee, N. D.

Oct. 8, 1968.

Robert F. Worthington, Jr., Robert L. Crossley, Baker, Worthington, Barnett & Crossley, Knoxville. Tenn.. for plaintiff.

Robert S. Young, McCampbell, Young & Bartlett, Knoxville, Tenn., for defendants.

## OPINION

ROBERT L. TAYLOR, Chief Judge.

This case involves a subcontract for repair of roofs at the Loring Air Force Base in the State of Maine. For convenience plaintiff, Southern Roofing & Petroleum Company, Inc., will be referred to as Southern, the defendant, Acme Roofing & Sheet Metal Company, as Acme, and its bondsman, Aetna Insurance Company, as Aetna. Southern's bid for roof work was accepted by the Government at a price of around $825,-000.00. The prime contract was executed sometime in February, 1967 and covered about 100 houses.

Soon after the contract was obtained, Southern sought to subcontract all of the work to two sub-contractors. Southern's president and chief stockholder, Douglas, phoned Traskos of Acme in Hartford, Connecticut, and explained the matter to him and asked him if he was interested in doing part of the work under a subcontract. Traskos advised that the matter would be given consideration. Later Traskos phoned Douglas that his company would do the work for $173,-000.00 in round figures. Prior to the submission of the figure of $173,000.00 Traskos had given what was described as a "ball park figure." When the real figure of $173,000.00 was given Douglas argued about the amount, claiming that it was too large but finally accepted it. Accordingly, on the 4th day of April, 1967, a subcontract was entered into between Acme and Southern.

In the course of events, a Mr. Walter Smith of Southern talked with Mr. Traskos of Acme in Hartford and at that time gave him some cost figures on some of the materials that were to be used on the project.

Upon the basis that Smith made material misrepresentations of fact to Traskos, Acme seeks to be relieved of the obligations under the contract upon the ground of fraudulent misrepresentations. In order to be successful in cancelling the subcontract, the burden of proof is upon Acme to establish the following elements:

1. That a misrepresentation of fact was made by Smith;

2. That the alleged misrepresentation was a material one;

3. That it was made with knowledge of its falsity or as being of Smith's knowledge when he only believed it to be true or that Smith was reckless in this as to whether it was true or false;

4. Smith must have made the misrepresentations to induce Acme to rely upon it;

5. Acme must have believed it and relied upon it, Acme must have been warranted in doing so and,

6. Finally, the statements must be such as to result in damage to Acme.

The most that Smith did on the occasion in question was to deliver some price quotations on gravel to Mr. Traskos, and the Court is unable to find from the evidence that Smith made any false misrepresentations to Traskos with regard to the project either intentionally or unintentionally. The charge of fraud, in the opinion of the Court, has not been established by the evidence and the Court thus finds that Acme's contentions on this subject are untenable. See 166 A.L.R. p. 938, et seq.; Am.Jur.2d, Building and Construction Contracts, Sec. 106; Emmerson v. Hutchinson, 63 Ill. App. 203; 17 C.J.S. Contracts § 157; Bolan v. Caballero, 220 Tenn. 318, 417 S.W.2d 538 (1967); Sec. 476, Restatement of the Law of Contracts.

Acme contends further that the contract is nonenforceable because under its terms the prime contractor, Southern,

was to cooperate with Acme in the operation of the work on the project and that Acme breached this provision. Acme contends that Mr. Douglas failed to cooperate in securing appropriate materials for the job and put obstructions in Acme's way in trying to do the job.

In that connection, Acme contends that Douglas demanded that its representatives do the impossible, namely, build the roofs without available gravel.

■ The evidence shows that Douglas was at the job site almost continuously from the time the work was started, that he consulted with Mr. Napolitano (Acme's superintendent on the job) from time to time about his needs, particularly the gravel which appeared to have been needed most. Douglas assisted or tried to assist Napolitano in getting the gravel; he caused tests to be made along with Cyr, who was Government engineer on the job. There is testimony to the effect that he spent one half day at a particular time in assisting Napolitano in getting a truck. It is true that he pressed Napolitano to get on the job and to get it done so as to avoid the penalty prescribed in the prime contract. This he had a right to do as the prime contractor so long as he was reasonable.

■ The Court must conclude that the subcontract cannot be voided by Acme on the ground that Southern failed to cooperate in the work under the contract.

Acme further contends that gravel and gravel stops were not available and that was the reason it could not continue with the work.

■■ It is fair to conclude from the evidence in this record that Napolitano did have trouble in procuring the gravel and gravel stops when he first entered on the job, but that was not the fault of Southern. Acme had a duty of its own to look out for the materials before entering into the subcontract, or if not before, soon afterwards in order to properly prepare to get the work done. One of the important facts that negatives the contention of Traskos that Smith misrepresented facts to him about the gravel was that sometime after he had the conversation with Smith his partner, Napolitano, met with Cyr and others on what has been referred to by the witnesses as a pre-construction conference at which time Cyr asked Napolitano if gravel was available. The reply was he hadn't done anything about the gravel and that it was not available. If Smith had obtained contracts for the gravel as contended by Acme, it is not reasonable to believe that Napolitano would have told Cyr that he had not made any arrangement for the gravel at that late date.

The question arises also whether gravel could have been obtained when Napolitano entered on the job with some six men. The proof is that there was approximately 150 tons of gravel at the job site which has been referred to as the Trombley gravel. Much has been said about whether that gravel met Government specifications.

The proof shows and the Court finds that Cyr, the chief engineer on the job, approved the Trombley gravel for the job. Douglas swears positively that it was used on the job. But aside from the Trombley gravel, there was gravel available from the McKay Rock Products, Inc. As evidence that gravel was available, Douglas purchased it and used it after he assumed the obligation under the contract. Napolitano and Traskos state that although the gravel may have been available it was not available when Napolitano entered on the work. In the opinion of the Court that cannot be charged as a fault to Southern. Acme had a duty to exercise reasonable effort to procure the gravel.

■■ In the opinion of the Court, and the Court finds, that there was no legal justification for Acme's abandonment of the project and its non-performance of the subcontract, and that when its representatives abandoned the job the subcontract was breached and Acme and its bondsman are liable for whatever damages were in the contempla-

tion of the parties. Dubois v. Gentry, 182 Tenn. 103, 184 S.W.2d 369 (1945); Wilson v. Page, 45 Tenn.App. 475, 325 S.W.2d 294 (1958).

Southern claims the following items of damages: Materials in the amount of $108,312.03. That item is not in dispute and is allowable.

Labor, $90,816.92. That item is in dispute. Southern filed claim relating to that item with the Armed Services Board of Contract Appeals which is now pending.

In that complaint, Southern asserted that "The specifications, at TP 5–06a(4) (a), require application of slag or gravel in quantities of 300 pounds per 100 square feet of roof surface. When Appellant began performance of the contract, the Project Engineer compelled Appellant to apply 400 pounds of gravel per 100 square feet of roof surface instead of 300 pounds. Appellant alleges that the specifications erred in this respect by omission of the figure '400' opposite the phrase 'roofing gravel.' Appellant alleges that this requirement by the Project Engineer, at variance with the specifications, unavoidably increased the Appellant's cost of materials and labor for gravel application by 33⅓%. Appellant's study indicates the additional cost for labor and materials occasioned by the increased requirement from 300 pounds to 400 pounds was $2.00 per 100 square feet, or a total of $18,800." Thus, Southern contends that it did $18,800.00 work on the project which was not covered by the contract and the Government is liable for it. If the Government is liable for it the subcontractor would not be liable. If the subcontractor had performed the work it could have required the Government to reimburse it to the extent of $18,800.00, if Southern is right in its contention before the Board. Acme is therefore entitled to a credit under this item of $18,800.00. Traskos testified that this expense of putting 400 pounds of gravel per one hundred square feet of roof surface instead of 300 pounds was outside of the subcontract work.

A portion of that $18,800.00 represents labor, a comparatively small portion represented materials. On that portion that represents labor, Acme is entitled to an additional credit of 20% since about 20% is added on to the labor cost for workmen's compensation insurance, Government insurance and other items.

Acme is entitled to another $6,000.00 reduction on that item because that represented work which was allegedly done by Southern over and above that called for in the prime contract, and if that is correct then Acme should not be required to pay for that which the Government allegedly owes. Traskos also testified that this work was not covered by the prime contract. In that connection, Southern had in its petition before the Board: "The drawings, at sheet 19 of 21, particularize the vent pipe flashing required by the contract, showing a flat base plate. In accordance therewith, 1,500 such vent pipe flashings were manufactured and paid for by Appellant. Their application to pitched roofs was accomplished at the outset of performance by bending the base plate down to conform to the building. Early in the performance of the contract, the Project Engineer insisted to the Appellant that the vent pipe flashings would not be sufficient as exemplified by the drawing aforesaid, but that caps for the vent pipes would be required in addition. Considerable dispute developed respecting this item, and significant delay was imposed upon the Appellant because of the Project Engineer's insistence upon the vent pipe caps. Thereafter, and when the Appellant's performance of the contract was more than half completed, the Project Engineer's demand for vent pipe caps was rejected by the contracting officer, the Appellant was compelled to refabricate the flashings so as to produce a pitch to the base plate (not shown by the drawing aforesaid), and the Appellant was also compelled to solder the rolltop of the vent pipe flashings, which latter procedure was nowhere provided for in the contract or specifications. The delay incurred by the Project Engineer's

unwarranted (and later abandoned) demand for caps, the reworking of the flashings, and the soldering as aforesaid all substantially increased the Appellant's cost of performing this portion of the contract. Appellant's study indicates the additional cost for labor and materials on account of the foregoing amounted to $4.00 per vent pipe, or a total of $6,000."

Freight item of $2,980.72 is unchallenged and is allowed, as is the unchallenged rental item of $584.97.

The parties agree that the equipment item expense of $8,325.55 should be divided in half; hence, Acme is entitled to a credit on this item of $4,162.77.

Travel expense items of $5,708.24, telephone and telegraph, $437.06, miscellaneous living expenses, $9,504.34, transportation, $1,066.00, gas and oil, $1,684.00, repairs, $542.43, contract labor, $461.19, are not in dispute and are therefore allowable.

 Attorneys' fees item of $527.80 is not allowable because, in the opinion of the Court, attorneys' fees in cases of this kind are items that should be paid by the respective employers of the attorneys. 17 Am.Jur.2d, Contractor's Bonds, § 135; Thayer v. Wright Company, 50 Tenn. App. 515, 362 S.W.2d 805 (1961).

The five percent overhead expense of the net figure which Southern is entitled to recover is not in dispute and is allowable.

The ten percent profit figure is in sharp issue. Southern contends with much logic that that item is a matter of contract between the parties and that this Court has no right to undertake to rewrite the contract with respect to the ten percent profit item.

 It is ordinarily true that a court has no right to rewrite contracts between parties. Acme contends, with appealing logic, that Acme was pressed hard by Douglas to do the thing that could not be done in the time given by Douglas. In that connection, Acme contends that through its representative, Traskos, or Napolitano, one or the other, probably the first named, asked for a little time to get the gravel, which request was denied. Traskos stated that he meant about three weeks time. He stated that Douglas refused to give him any time. Douglas stated that he was not asked for time; that if he had been asked for more time he would have gladly given more time and would have gone to the Government engineer and requested an extension of time.

The Court is of the opinion that Napolitano and Traskos had a great amount of trouble in getting gravel that met Government test to the job site while Napolitano was on the job. This caused much frustration to both Traskos and Napolitano. True, they were not free from fault because they should have looked after the gravel long before that time. Neither is Douglas, in the opinion of the Court, wholly free from fault with respect to the issue of the pressing demands made by him on Traskos and Napolitano to get back to work. Douglas' position was understandable, he was obligated to fulfill work on a contract involving $825,000.00 so he wanted to get the work done.

Decision was reserved on the ten percent profit item provided for in the contract and the attorneys were requested to file briefs within five days from the date of the conclusion of the hearing dealing with this item. The briefs have been filed and examined.

Acme clearly agreed that in the event of its non-performance it would be liable for Southern's cost in excess of the subcontract price, plus ten percent of that amount.

 The Court should not make a new contract for the parties unless the agreement is void as a penalty against public policy. Guardian Life Ins. Co. v. Richardson, 23 Tenn.App. 194, 129 S.W.2d 1107 (1939); Central Drug Store v. Adams, 184 Tenn. 541, 201 S.W.2d 682 (1947); Dubois v. Gentry, 182 Tenn. 103, 184 S.W.2d 369 (1945); Southern Style Shops v. Mann, 157 Tenn. 1, 4 S.W. 2d 959 (1928).

■ Although Southern would characterize the ten percent additional allowance as compensation for Southern's work, it will be deemed an element of damages for decision on the issue of the asserted penalty. The Tennessee decisions have indicated that liquidated damage provisions will be upheld if the following conditions are satisfied:

> (1) the agreed damages are reasonably proportionate to actual damages in contemplation of the parties when the contract was made;

> (2) the actual damages are uncertain and difficult of proof; and

> (3) the promisee cannot be placed in as good a position as if no breach of contract had occurred.

Railroad Co. v. Southern Seating and Cabinet Co., 104 Tenn. 568, 58 S.W. 303, 50 L.R.A. 729 (1900); Hasden v. McGinnis, 54 Tenn.App. 39, 387 S.W.2d 631 (1964); Patterson v. Anderson Motor Company, 45 Tenn.App. 35, 319 S.W.2d 492 (1959).

In the instant case the agreed damages are reasonable in relation to the actual contemplated damages. As an experienced contracting organization, Acme must have known that if it failed to perform and Southern should take up the performance, Southern would have to give up opportunities for projects and profits elsewhere. Nor could Acme contemplate that Southern would be compensated for the loss of opportunities by the profit margin in Acme's subcontract price. The delay and expense that would naturally be expected from causing Southern to undertake completion would tend materially to lessen any profit margin in a project in which time was of the essence. Further, Acme should be taken to have anticipated that cessation of work on their part when time was important would lessen Southern's chances of immediately negotiating a reasonable replacement subcontract. It appears to the Court that the parties anticipated that incomplete performance by Acme would cause some damage over and above the actual out-of-pocket expenses.

■ The measure of such damages as lost opportunities and disruption of plans is so uncertain that a court might be justified in refusing to award them because they were speculative. More appropriate to this case, however, is the principle that liquidated damages are proper when the amount of damage is uncertain or difficult of proof. Patterson v. Anderson Motor Co., supra; City of Memphis, Tenn., for and on Behalf of Memphis Light, Gas and Water Division v. Ford Motor Co., 304 F.2d 845 (C.A. 6, 1962). The ten percent rate of compensation is not so great as to imply oppression, but appears to be a reasonable estimate of damages in excess of cost due a promisee who must complete the performance of a defaulting promisor. The amount does not appear to be so out of proportion to anticipated damages that it raises an inference that the provision was intended as a club to coerce full performance. The Court concludes that the ten percent clause was not a penalty as that doctrine is applied in Tennessee.

Two Court of Appeals decisions confirm that conclusion on the issue. The Sixth Circuit Court indicated in City of Memphis, Tenn., for and on Behalf of Memphis Light, Gas and Water Division v. Ford Motor Company, supra, that the trend of decisions is to give effect to liquidated damage agreements, particularly when there is no inference of fraud or oppression and when actual damages are difficult of ascertainment. Bargaining arms-length as businessmen in the absence of any coercion, Acme agreed to the ten percent clause. The Ninth Circuit Court held under a fact situation very close to the instant case that such a cost-plus-ten-percent provision in a building subcontract is enforceable. Dale Benz, Inc., Contractors v. American Cas. Co., 303 F.2d 80 (C.A. 9, 1962).

■ Aetna agrees in bond contract to pay the reasonable costs of completing the job and in addition specifically incorporates by reference the Southern-Acme contract. The Court is of the opinion that Aetna as surety for performance of Acme's contract is bound

with Acme by the ten percent clause. We have heretofore concluded that the ten percent amount was part of Southern's reasonable costs of taking up performance of Acme's contract. Moreover, incorporation of the subcontract into the bond made the ten percent provision a part of the agreed liabilities which the bond secured. 11 C.J.S. Bonds § 43, at p. 423. See also, Engert v. Peerless Insurance Company, 53 Tenn.App. 310, 382 S.W.2d 541 (1964); Dale Benz, Inc., Contractors v. American Casualty Company, supra.

■ The plaintiff has stated that the rule in Tennessee as to pre-judgment interest is that such an award is a "matter of discretion in the jury or chancellor, to be allowed or not, according to the facts presented." We agree. Oman Construction Company v. City of Nashville, 49 Tenn.App. 171, 353 S.W.2d 97 (1961); Engert v. Peerless Insurance Co., supra, 382 S.W.2d p. 550. The facts and circumstances in this case do not justify interest on the recovery.

An order will be presented in conformity with the views herein expressed.