IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 16, 2006 Session

## BFS RETAIL AND COMMERCIAL OPERATIONS, LLC v. CHARLES SMITH

Appeal from the Chancery Court for Davidson County
No. 05-636-II     Carol McCoy, Chancellor

No. M2006-00163-COA-R3-CV - Filed on February 12, 2007

National retail tire and automotive service corporation filed action against district manager for violation of corporation's covenant not to compete after manager resigned and accepted new position with corporation's competitor. Trial court granted manager's motion for summary judgment, finding that manager had not violated the non-compete agreement since manager's new position was located outside the geographic location in which he was previously employed by corporation. Corporation appealed. Finding that the provisions of the contract are not, as a matter of law, limited to a geographic component, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J., joined. WILLIAM C. KOCH, JR., P.J., M.S., filed a separate concurring opinion.

Robert E. Boston, Andrew S. Naylor, Rebekah J. Stephens, Nashville, Tennessee, for the appellant, BFS Retail and Commercial Operations, LLC.

Charles W. McElroy, Dudley M. West, Nashville, Tennessee, for the appellee, Charles Smith.

## OPINION

Mr. Charles Smith began working for Bridgestone Firestone Retail & Commercial Operations ("BFRC"), a corporation owning and operating over 2,000 retail tire and automotive service stores nationwide, in October 1989 as a retail associate in Maryland. Mr. Smith thereafter relocated to Pittsburgh, Pennsylvania in 1990, where he spent the remainder of his career with BFRC. While in Pittsburgh, Mr. Smith first worked as a service manager then as an assistant manager, before being promoted to store manager in 1991. Mr. Smith became BFRC's assistant district manager of the Pittsburgh district in 2001 and district manager in 2003. As district manager of the Pittsburgh district, Mr. Smith was responsible only for the performance of the stores located within his district.

As a condition of promotion, BFRC required that Mr. Smith sign an employment agreement containing a covenant not to compete which prohibited Mr. Smith, for a period of eighteen months after termination, from competing with BFRC with respect to its "Company Business" in any "area where [he] worked or had responsibilities". On March 7, 2005, Mr. Smith gave two weeks notice of his resignation and of his intent to accept a new position with BFRC's competitor, Tire Kingdom, as the regional director of sales in South Carolina. Mr. Smith's new position required direct responsibility for twenty-six stores in South Carolina and one store in Georgia, as well as indirect supervisory responsibility for twenty-four stores in Charlotte, North Carolina and four stores in Tallahassee, Florida.

On March 9, 2005, BFRC filed an action against Mr. Smith, seeking to enjoin Mr. Smith from working for Tire Kingdom. BFRC obtained an *ex parte* restraining order preventing Mr. Smith from commencing his new job but after a preliminary injunction hearing on April 8, 2005, the trial court denied BFRC's motion for a preliminary injunction. Mr. Smith filed a motion for summary judgment on September 15, 2005, arguing that he had not breached his non-compete agreement with BFRC since he was not working for a competitor in the same geographic location as he was employed by BFRC. The trial court granted Mr. Smith's motion on November 22, 2005, finding that (1) Mr. Smith did not breach his non-compete agreement by working for Tire Kingdom in a geographic location outside the Pittsburgh district; and (2) even if the non-compete agreement protected against Mr. Smith's infringement of BFRC's substantive rights, the non-compete provision was overly broad as a matter of Tennessee law. BFRC appealed.

## I.

Pursuant to Rule 56 of the Tennessee Rules of Civil Procedure, summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." The court must take the strongest legitimate view of the evidence in favor of the non-moving party, resolve all reasonable inferences in favor of that party, discard all countervailing evidence, and if there is a dispute as to any material fact, summary judgment cannot be granted. *Byrd v. Hall*, 847 S.W.2d 208, 210-11 (Tenn.1993). Because summary judgment involves only questions of law and no factual disputes, no presumption of correctness attaches to the lower court's decision and the judgment is reviewed using a pure *de novo* standard. *Cowden v. Sovran Bank/Central South*, 816 S.W.2d 741, 744 (Tenn.1991).

## II.

The interpretation and construction of a plain and unambiguous written contract is a question of law for determination by the court. *Williamson Co. Broad. Co., Inc. v. Intermedia Partners*, 987 S.W.2d 550, 552 (Tenn.Ct.App.1998). It is the duty of the court to enforce the contract according to its plain terms, *Eleogrammenos v. Standard Life Ins. Co.*, 149 S.W.2d 69 (Tenn.1941), and the language used in the contract must be taken and understood in its plain, ordinary and popular sense. *Guardian Life Ins. Co. of Am. v. Richardson*, 129 S.W.2d 1107, 1116-17 (Tenn.Ct.App.1939). However, "the cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention as best can be done consistent with legal principles." *Petty v.*

*Sloan*, 277 S.W.2d 355, 360 (Tenn.1955). Courts may determine the intention of the parties "by a fair construction of the terms and provisions of the contract, by the subject matter to which it has reference, by the circumstances of the particular transaction giving rise to the question, and by the construction placed on the agreement by the parties in carrying out its terms." *Penske Truck Leasing Co., L.P. v. Huddleston,* 795 S.W.2d 669, 671 (Tenn.1990).

In the present case, the trial court determined that the covenant not to compete in Mr. Smith's employment agreement was plain and unambiguous and that the contract did not prohibit Mr. Smith from working for Tire Kingdom as the regional director of sales in South Carolina. The covenant not to compete specifically provided in pertinent part:

12. POST-EMPLOYMENT:

NO COMPETITION WITH THE COMPANY'S BUSINESS

For a period of eighteen (18) months following your departure from the Company, unless your termination is due to an involuntary reduction of force you agree not to:

(a) enter into or engage in any business which competes with the Company's Business;

...

(e) For purposes of subparagraphs (a) through (d) only, the Company's Business includes only those *areas where* you worked or had responsibilities at the time of your separation from the Company or at any time during the five (5) year period prior to your separation. (Emphasis added).

The trial court found that the language of the non-compete agreement, when given its plain and ordinary meaning, limited the *geographic or territorial area* in which Mr. Smith could work after his separation from BFRC. Since Mr. Smith limited his employment with BFRC to the Pittsburgh district and his position with Tire Kingdom included responsibilities primarily in South Carolina, the trial court found that Mr. Smith did not breach his non-compete agreement by working for Tire Kingdom in a geographic location outside the Pittsburgh district.

However, BFRC argued that the non-compete agreement was not intended to geographically limit Mr. Smith's post-employment opportunities but rather, limit the *substantive* field of responsibilities encompassed in Mr. Smith's work for BFRC. According to BFRC, the BFRC districts do not operate in a vacuum and thus, business information and trade knowledge is shared nationally. BFRC alleged that it allowed Mr. Smith access to confidential business information via BFRC's intranet system, including core operation principles, management strategies, economic forecasts, marketing initiatives, and economic performance data, on a nationwide scale during his employment at BFRC. Therefore, simply limiting Mr. Smith's post-employment initiatives to geographical regions would fail to fully protect BFRC's proprietary rights. Instead, BFRC claims

that the non-compete agreement prohibited Mr. Smith from entering into or engaging in the "research, development, manufacture, marketing, sale and distribution of tires" for a period of eighteen months following his departure from BFRC since those were the functional areas for which he was employed by BFRC.

It is well established that in interpreting a contract, the court should consider the entire contract, *Cocke Co. Bd. of Highway Comm'rs v. Newport Util. Bd.,* 690 S.W.2d 231, 237 (Tenn.1985), and the "situation involving the parties, the nature of the business in which they are engaged and the subject matter to which the contract relates." *Stovall v. Dattel,* 619 S.W.2d 125, 127 (Tenn.Ct.App.1981). "No single clause in a contract is to be viewed in isolation; rather, the contract is to be 'viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another.'" *Frizzell Constr. Co., Inc. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn.1999) (quoting *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.,* 690 S.W.2d 231, 237 (Tenn.1985)).

In rejecting the argument of BFRC that the restriction of competitive employment by Mr. Smith during the eighteen months following his resignation was not limited as a matter of law to a geographical limitation, the trial court held:

> The Court rejects the arguments made by BFRC that paragraph 12(e) of the Employment Agreement does not constitute a geographical limitation, and that the non-compete provisions apply without regard to territory, limited only by the substantive fields of responsibilities encompassed in Mr. Smith's work for BFRC. In rejecting these arguments, the Court relies primarily on the plain and ordinary meaning of the words used, and the plain geographic connotations conveyed by the phrase "areas where [he] worked or had responsibilities." In addition, the Court finds that accepting BFRC's argument that the limitation means something other than the geographic area where Mr. Smith worked, would inject an unreasonable ambiguity into the contract, where no ambiguity otherwise exists. The Court will not inject an ambiguity where none exists, and accordingly, rejects BFRC's argument.

> Furthermore, even if the Court were to accept BFRC's argument that its non-compete provisions contain no territorial or geographic limitations (which it does not) the result would be a covenant not to compete that, in the Court's opinion, would be overly broad. Under Tennessee law, covenants not to compete must be reasonable in scope, and with respect to time and territorial limits, must be no broader than necessary to protect the employer's legitimate business interests. *See, e.g., Vantage Technology, LLC v. Cross*, 17 S.W.3d 637, 647 (Tenn. App. 1999), *perm. to app. denied* (Tenn. 2000). In the case at bar, the contract construction urged by the plaintiff would create a contract that is overbroad, and which could not be enforced based on the facts in this record.

In conclusion, the contract at issue in this case is clear and unambiguous in the limitation of the territorial scope of the covenant not to compete to those geographic areas where Mr. Smith worked or had responsibilities for BFRC. Mr. Smith worked and had responsibilities only within BFRC's Pittsburgh District, which does not include any of the areas where he now works or has responsibilities for Tire Kingdom, Inc.

While this reasoning of the trial court might well be unimpeachable following a trial on the merits, we are not dealing at this stage with appellate review following a trial on the merits but rather appellate review of a trial court grant of summary judgment. A review of paragraphs 11 and 12 in isolation from all other provisions of the contract might yield to a logical conclusion that paragraph 12, like paragraph 11, was a geographical limitation since any other interpretation would evidence no contrast between paragraph 11 and 12 and as conceded by counsel for BFRC, render paragraph 12 unnecessary. We are not at liberty to construe paragraphs 11 and 12 in isolation from all the other provisions of the contract. *Frizzell Constr. Co., Inc.*, 9 S.W.3d at 85.

Pertinent provisions of the contract are:

Employment agreements are very common in business, and certainly in our industry. The purpose of this Employment Agreement is to protect our Company and its employees. Information is our competitive advantage. When information about our Company's products, services, or intelligence of any kind, is inappropriately disclosed, our Company and our employees are in peril. Therefore, this Agreement is important for the security of Bridgestone/Firestone and its future, as well as the future of our employees and their families.

We take great pride in our employees at Bridgestone/Firestone. We have worked hard to identify the best talent available. We want to keep our talented people with us. When BFS is no longer the best fit for a person, however, we must make sure that our information remains with the Company even after the person has taken other employment opportunities.

Your signature on this Agreement is a condition of your transfer or promotion into/within an exempt salary level position.

. . .

1. DEFINITIONS

For the purposes of this Employment Agreement, the following definitions apply:

. . .

(b)  COMPANY'S BUSINESS.    The Company's Business is the research, development, manufacture, marketing, sale and distribution of tires, tire components, polymers used in tires or elsewhere, roofing materials, air springs, or any other products or services of the Company or contemplated by the Company.

(c)  CONFIDENTIAL AND PROPRIETARY TRADE SECRET INFORMATION.  Confidential and proprietary trade secret information includes, without any limitation, the Company's research and development information, unique selling, manufacturing and servicing methods and business techniques, manufacturing, training, service and business manuals, training courses and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information and other business information, as well as any other information that constitutes a "trade secret" as that term is defined under the Uniform Trade Secret Act.

. . .

## 8.  ACCESS TO CONFIDENTIAL AND PROPRIETARY INFORMATION

Confidential and proprietary trade secret information is developed by the Company through substantial expenditures of time, effort and money.  It is valuable and unique property of the Company.  In order to protect the business of the Company, you agree that any confidential and proprietary trade secret information that you receive during your employment with the Company must be kept confidential both during and after your employment.  You also understand and agree that because of this, it is necessary for the protection of the business of the Company that you not compete with the Company during your employment and not compete with the Company's Business for a reasonable period of time after your employment, as described in Sections 11 and 12 of this Agreement.

## 9.  NO DISCLOSURE

You agree to keep in strict confidence any confidential and proprietary trade secret information that you learn during your employment regarding the Company, the Company's Business, its customers, vendors, or any other third parties. You will not, directly or indirectly, at any time during or after your employment with the Company, disclose or use any confidential and proprietary trade secret information owned by the Company or any third party which you learn of as a result of your activities on behalf of the Company no matter when or how the information was acquired. You agree that this information, no matter whether written, spoken, or remembered, cannot be disclosed for any unauthorized reason.

. . .

## 11. DURING EMPLOYMENT:
### NO COMPETITION WITH THE COMPANY

During your employment, you agree not to compete with the Company anywhere in the world. This includes, but is not limited to an agreement not to:

(a) enter into or engage in any business which competes with the Company's Business;

(b) solicit customers, business, patronage or orders for or the sale of any products or services in competition with the Company's Business;

(c) divert, entice, or take away any customers, business, patronage or orders of the Company's Business or attempt to do so; or

(d) promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's Business.

## 12. POST-EMPLOYMENT:
### NO COMPETITION WITH THE COMPANY'S BUSINESS

For a period of eighteen (18) months following your departure from the Company, unless your termination is due to an involuntary reduction of force you agree not to:

(a) enter into or engage in any business which competes with the Company's Business;

(b) solicit customers, business, patronage or orders for or sale of any products and services in competition with the Company's Business;

(c) divert, entice or otherwise take away any customers, business, patronage or orders of the Company's Business or attempt to do so; or

(d) promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other engaged in any business which competes with the Company's Business.

(e) For purposes of subparagraphs (a) through (d) only, the Company's Business includes only those areas where you worked or had responsibilities at the time of your separation from the Company or at any time during the five (5) year period prior to your separation.

. . .

14. POSTPONEMENT OF FUTURE EMPLOYMENT

Before accepting post-employment with any person, firm, association, partnership, or other entity that is in competition with the Company's Business, as described in Section 12, you agree to provide to the Company verifiable evidence of a written offer of employment and written proof of your intent to accept the offer. The Company then may elect to permit you to pursue the employment opportunity. Alternatively, the Company may elect, due to your knowledge of confidential and proprietary trade secret information, to require you to postpone the employment for eighteen (18) months.

If postponement of employment is required, the Company will provide you with post-employment payments. A post-employment payment is a monthly payment made to you that is equal to your final monthly pay plus 25% of that same monthly base pay. Pension and/or other retirement benefits and any state unemployment benefits you receive during this period will be deducted from these payments. Additionally, to the extent that you are eligible to receive any pension income or payments, and you elect or choose to defer your receipt of such pension income or payments, the post-

employment payment will be reduced by the pension income or payments that you would have received if you had not chosen to defer your receipt of pension income or payments.

The Company expects you to make a good faith effort to obtain employment with a non-competing business while you are receiving post-employment payments. If such a job is found, your post-employment payments will be reduced by any earning from your new position. Also, during the eighteen (18) month period, you must provide the Company with quarterly written documentation, which demonstrates your good faith efforts to find other employment.

If at any time during the eighteen (18) month period you request outplacement assistance, the Company will provide it to you, at the Company's expense.

When these provisions are considered together, and not in isolation, paragraph 12(e) does not, as a matter of law, require a construction limited to geographic areas, but may reasonably be interpreted to include products areas. Indeed, one might seriously assert that paragraph 14, standing alone, can justify postponement of future employment for an eighteen-month period following the resignation of Mr. Smith. It is supported by an independent consideration requiring BFRC to pay Mr. Smith 125% of his base salary during the eighteen-month period. While this income may pale in comparison to his overall income with BFRC, when base pay is added to commission income, no rule of law requires that the substantial consideration necessary to support the bilateral obligation of a contract must be of equal dignity between the parties or is subject to a comparative value analysis. *Farrell v. Third Nat'l Bank in Nashville*, 101 S.W.2d 158, 163 (Tenn.Ct.App.1936).

The postponement of employment under paragraph 14 of the Agreement has nothing to do with geography, but is "due to your knowledge of confidential and proprietary trade secret information."

Whether paragraph 14 could stand alone is not determinative of the issue in this case, but when paragraph 14 is considered in conjunction with paragraph 12(e), the phrase "those areas where you worked or had responsibilities at the time of your separation" is subject to a reasonable construction that is other than geographic. Summary judgment is thus improper.

The Supreme Court of Tennessee long ago held that a contract must be considered as a whole and:

in the light of the circumstances surrounding its making, with the primary purpose of ascertaining just what was within the contemplation of the parties. As expressed by Edward Beal, English author and scholar, in his Cardinal Rules of Interpretation (2d Ed.) page 71, "The purpose of interpreting an instrument is to see what is the intention expressed by the words used. If from the imperfection of language it is impossible to know what the intention is without inquiring further, then see what the circumstances were with reference to which the words were used, and what was the object, appearing from those circumstances, which the persons using them had in view."

*Holmes v. Elder*, 94 S.W.2d 390, 391-92 (Tenn.1936).

Whether the competitive restrictions of the Agreement are geographical or include products areas involves material questions of fact as to the intentions of the parties. The judgment of the trial court granting summary judgment to Defendant is reversed and the case remanded for further proceedings. Costs of the cause are assessed to Appellee.

_____
WILLIAM B. CAIN, JUDGE